**CREST CONSTRUCTION, INCORPORATED, Appellant,**

**v.**

**Judy MURRAY, Appellee.**

**No. 09–93–225 CV.**

Court of Appeals of Texas, Beaumont.

Dec. 8, 1994.

Rehearing Overruled Jan. 17, 1995.

E.M. Schulze, Jr., Davis, Durham & Schulze, Huntsville, for appellant.

William C. Ferebee, O'Donnell, Ferebee & McGonigal, P.C., Houston, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

An appeal by Crest Construction, Incorporated (Crest) from an adverse judgment.

The appeal involves certain sub-contracts on three different construction projects. These three projects were referred to during the trial and in the briefs as the "Borden Job", the "Cooper Job", and the "Beaumont Job". On these three construction jobs, Jim Murray acted as a concrete sub-contractor under Crest. Murray's performance or lack of completion thereon triggered this litigation. At this point in our opinion we visit no moral or ethical wrongdoing on Murray's part.

Crest initiated this litigation when, it was alleged, that Judy Murray ignored and violated a waiver of all rights to lien claims [1] that had been signed by her husband, Jim Murray, during his lifetime. Crest contended that Judy, individually and as Independent Executrix, had filed a groundless and waived, and forbidden lien claim affidavit on the "Beaumont Job", thus preventing Crest from being paid by CCI, the general contractor on the "Beaumont Job". CCI then filed pleadings in the nature of an interpleader. CCI was the general contractor for the Southeast Texas Rehabilitation Hospital Project in Beaumont, Texas. This was the "Beaumont Job". Crest was a sub-contractor under CCI and Jim Murray was a sub-contractor under Crest. Murray was to perform the concrete and cement work. CCI pleaded that a dispute arose between Crest and Murray as to the amount of money owed to Murray on the "Beaumont Job". CCI tendered $71,509.51 into court.

CCI averred that it was informed that Murray had agreed to accept a certain, unse-

1. **WAIVER OF LIEN**

THE STATE OF TEXAS
COUNTY OF JEFFERSON

The undersigned contracted with Crest Construction, Inc. to furnish concrete, labor and materials in connection with certain improvements to real property located in Jefferson County, Texas, and owned by Beaumont Rehab, Inc. and/or Southeast Texas Rehabilitation Hospital, Inc., which improvements are described as follows:

See Exhibit "A", attached.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and confessed, the undersigned does hereby waive and release any mechanic's lien or materialmen's lien or claims of lien that the undersigned has on the above-mentioned real property and the improvements which the undersigned has or hereafter has on the above-mentioned real property on account of any labor performed or materials furnished or to be furnished or labor performed and materials furnished by the undersigned pursuant to the above-mentioned contract or any constitutional lien that the undersigned may have.

/s/ James E. Murray
James E. Murray, d/b/a
Murray's Construction Co.
29822 Twisted Oaks Drive
Spring, Texas 77381

SUBSCRIBED AND SWORN TO BEFORE ME by James E. Murray on this the 14 day of January, 1991, to certify which witness my hand and seal of office.

/s/_____
Notary Public in and for the
State of Texas

My Commission Expires: _____

cured promissory note in the amount of $36,-000 payable from Crest to Murray in full and final settlement of all disputes, issues, and contentions on the "Beaumont Job". But other separate, distinct disputes arose between Crest and Murray on two other, unrelated jobs where Murray was a sub-contractor to Crest. These two other jobs were the "Cooper Job" and the "Borden Job". CCI had no relationship to the "Cooper Job" or the "Borden Job". CCI by proper pleadings advised the court that Judy Murray, individually and as Independent Executrix, was making a lien claim against Crest on the "Beaumont Job". Crest maintained that a full, final, and all-inclusive settlement agreement had been consummated between Crest and Jim Murray. The agreement provided only for the $36,000 note and affirmatively forbade the making or filing of any type of lien claim on the "Beaumont Job".

Thus CCI was exposed to conflicting claims exposing CCI to multiple liability. CCI was a party to the "Beaumont Job"—but no other. Thereupon, CCI tendered into the registry of the district court the retained amount of $71,509.51 on the "Beaumont Job". This amount was the entire retainage. CCI pleaded for relief seeking a declaration that all liens and all other claims of the sub-contractors (Crest and Murray) asserted against the Beaumont property involved, that was the subject of the project on the "Beau-

mont Job", shall be judicially deemed satisfied, paid, and released. The CCI interpleader was disposed of by the bench according to an agreed judgment fully approved by CCI, Crest, and Judy.

### The Jury Trial on the Merits Between Crest and Murray (Judy)

A number of questions were posed to the jury. The jury found, in substance, that by filing of record and sending a copy of the Mechanic's and Materialmen's Lien Affidavit dated April 8, 1991,[2] to CCI, Judy Murray was *not* guilty of intentionally interfering with the right of Crest to receive timely, final payments under its contract with CCI on the "Beaumont Job". The jury's answer was favorable to Judy Murray in her two capacities.

In answer to Jury Question No. 2, the jury was asked was Murray justified in filing the lien for approximately $62,000 plus on the "Beaumont Job", even though the settlement called for Crest to execute a $36,000 unsecured promissory note containing strict provisions as to when the note matured and became due. The jury answered, "Yes"—in effect Judy was justified. The jury found that Murray was justified in interfering with Crest's contractual rights with CCI if such action was done in a good faith assertion of legal rights. We, under this record, totally disagree on these jury questions and an-

**2. MECHANIC'S AND MATERIALMEN'S LIEN AFFIDAVIT**

THE STATE OF TEXAS
COUNTY OF JEFFERSON

I, Judy Murray ("Affiant"), widow of James E. Murray and acting as non-qualified community administrator pursuant to the provisions of Section 160, Texas Probate Code, hereby state under oath, the following:

1. James E. Murray, prior to his death in February of 1991, did business as Murray's Construction Co. ("Claimant"), with its principal place of business in Spring, Texas.

2. Beaumont Rehab, Inc., and Southeast Texas Rehabilitation Hospital, Inc., ("Owner") is the owner or reputed owner, of the real property ("Land") and the improvements situated thereon, located in Jefferson County, Texas more commonly known as 3340 Plaza Ten Blvd., Beaumont, Texas, and more particularly known as follows:

See Exhibit "A", attached.

3. Claimant has performed work to improve the Land and the improvements situated thereon pursuant to a contract with Crest Construction, Inc., and to whom Claimant furnished the material or labor described as follows:

concrete, labor and materials

4. Commercial Construction, Inc. is the original contractor under whom Claimant performed the labor or furnished the material.

5. The amount of the claim is $62,727.00 which amount remains unpaid. The Claimant claims a statutory mechanic's and materialmen's lien upon the Land and improvements thereon to secure payment of it claim.

6. Claimant's business address is 29822 Twisted Oaks Drive, Spring, Texas, 77381.

/s/
Judy Murray, Affiant

SWORN TO AND SUBSCRIBED TO before me under my hand and seal of office this 8 day of April, 1991.

/s/
Notary Public in and for the
State of Texas

swers. We conclude that Judy's positions on the filed liens are insupportable.

Neither Jim nor Judy had a right to file a Mechanic's and Materialmen's Lien claim or other type of lien or claim on the "Beaumont Job". Unquestionably, neither had the right to file a $62,000 plus lien nor did either of them have a right to send copies to CCI. Under the rule of integrated, final, complete settlement agreements neither had a right to file even a $36,000 lien. Both parties had to adhere to all of the provisions of the Beaumont settlement agreement. Appellee, in this record, admitted that a complete and final compromised settlement agreement was reached on all issues and disputes relevant to the "Beaumont Job". The "Beaumont Job" settlement was separate, distinct, and independent of any problems or disputes on the "Borden" or "Cooper Jobs". Under restrictive predicates, a certain number of jury questions were not answered.

The jury also found that James E. Murray did not breach his sub-contracts by failing to provide and pay for all of the labor and materials on the "Borden" and "Cooper Jobs". The jury was instructed in connection with this question that lack of performance may be excused where the same contract had been previously materially breached by the other contracting party. This special answer was favorable to James E. Murray and his Independent Executrix.

Question No. 10 read: "Did Crest Construction, Inc. fail to receive all of the consideration it was to receive in return for execution of the $36,000.00 note on the Beaumont Job?" The jury answered, "No." Thus Crest received all consideration given for the $36,000 note under the jury's answer. We disagree. The jury in four separate answers denied any attorney's fees whatsoever for the services of Crest's lawyers.

Jury Question No. 13 read: "Did Crest and Jim Murray agree that Murray would be entitled to receive weekly payments from Crest on the Borden and Cooper Jobs?" The jury answered, "Yes." To Jury Question No. 14 which read: "Did Crest fail to comply with the agreement, if any, by failing to make weekly payments on the Borden and Cooper Jobs prior to November 7, 1990?" The jury answered, "Yes."

The jury also found that there was no sum of money that would (or should) be awarded to fairly or reasonably compensate Murray for damages, if any, that resulted from such failure of Crest to perform weekly payroll advances on the "Borden" and "Cooper Jobs". Thus, the Murrays were entitled to nothing on the "Borden" and "Cooper Jobs".

But to Jury Question No. 16 the jury did find that Crest failed to comply with the agreement of January 14, 1991 on the "Beaumont Job", by refusing to pay the $36,000 note in toto without claiming offsets. The jury answered, "Yes."

The jury awarded $36,000 to Murray for the damages resulting from the failure of Crest to comply with the Beaumont settlement agreement.

The jury was asked if Murray performed "compensable work" for Crest on the "Borden" and "Cooper Jobs". The jury answered, "Yes." The jury found that the reasonable value of such *compensable work* on these two jobs was the sum of $17,670. Attorney's fees were awarded to Judy Murray's attorney for $20,000 for trial work plus $2,000 if an appeal were taken to the Court of Appeals. These jury questions inquiring about "compensable work", we determine, were clearly erroneous.

### The Provisions of the District Court's Judgment

Judy Murray, individually and as Independent Executrix of the estate of James Murray, deceased, received awards and recovered from Crest the following in the trial court's judgment below:

1) The sum of $36,000.00, pursuant to the terms of the Note and Settlement Agreement of January 14, 1991 [the "Beaumont Job" settlement]; and

2) The sum of $13,531.66 on its [Judy's] quantum meruit claim; and [on the Borden and Cooper Jobs]

3) Attorneys fees for trial of this case in the amount of $20,000.00; and

4) The sum of $2,000.00 in additional attorneys fees in the event an appeal to the

Court of Appeals is made but is unsuccessful; and

5) Pre-judgment interest upon the $36,000.00 award at the rate of 18% per annum from and after August 20, 1991, [being the date CCI placed the retainage in the court's registry] until the date of judgment in the amount of $10,332.49;

6) Pre-judgment interest at the rate of 6% per annum on the award of $13,531.66 until the date of entry of this Judgment in the amount of $1,864.03;

7) Post-judgment interest at the rate of 10% per annum on the award of $13,531.66, together with the awards of attorneys fees; and

8) Post-judgment interest on the $36,000.00 at 18% per annum.

Although there is a similarity of their corporate names, CCI and Crest are unrelated, legal entities.

The three jobs involved concrete and cement sub-contracting and were conducted and performed pursuant to oral and allegedly partially executed written sub-contracts for fixed contract prices. And significantly, these exact, fixed contract prices were stipulated in the record in open court by both parties and their attorneys on the "Borden" and "Cooper Jobs". On these two jobs Crest was the general contractor.

Found in the record:

MR. SCHULZE: *It's been stipulated between Crest Construction and Judy Murray and the estate of James Murray that the contract price on the Borden job was 28,500 and the contract price on the Cooper job was 32,300.*

MR. FEREBEE: That's correct, your Honor.

MR. SCHULZE: Also stipulated.

THE COURT: *That is so stipulated and approved and will be accepted by the Court as received. Do you want it announced to the jury as well?*

MR. SCHULZE: *Yes, sir, I think we should.*

THE COURT: *All right. Remind me.*

MR. SCHULZE: Okay. And then the parties also stipulate that, we haven't really worked out the wording on this, but as to all actions germane to this cause, *that the firm of O'Donnell Ferebee and McGonigal has been acting as the agent of Judy Murray, Jim Murray, Judy Murray or the estate of James E. Murray?*

MR. FEREBEE: *That's correct, your Honor.*

THE COURT: *Stipulation is approved and will be mentioned to and passed on to the jury.* (emphasis added)

Note that the *"contract price"* on the "Borden" and "Cooper Jobs" were agreed to. The "contract price" was stipulated to the penny. The "contract price" on each job proved a contract. Thus the theory of quantum meruit is eviscerated and disemboweled.

Jim Murray had been receiving sub-contracts in writing and signing the same in many instances and acting as a sub-contractor for cement work for Crest for about 10 years or slightly less prior to the disputes made the basis of this litigation. Mr. Murray had heart surgery in 1988 and apparently suffered a stroke in 1989.

But Crest continued to sub-contract work to Murray.

Seemingly, the "Beaumont Job" was one of the first jobs in quite a long period of time that was as far removed as it was from Conroe. Conroe was the home location of Crest and Murray Construction. Judy accompanied her husband Jim to Beaumont to be around the job site. Judy had testified that it was a wonderful opportunity even though Jim Murray had undergone heart surgery and had suffered a stroke. Nevertheless, Crest agreed and Jim agreed to continue with the Beaumont work although an employee with Crest also aided Murray because of Crest's employee's expertise. Mr. Murray, himself, thought that the "Beaumont Job" was a wonderful opportunity under all of the surrounding facts and circumstances.

As time elapsed, Murray had the experience of a severe cash flow problem. In another part of the record, Judy affirmatively stated that the job in Beaumont was a wonderful opportunity but that it was a fi-

nancial strain because they (the Murrays) had a severe cash flow problem. Judy explained that the Murrays were going to have to employ many extra people on the "Beaumont Job" and it was very difficult to carry that kind of a payroll. The "Beaumont Job" was a big job for the Murrays. Judy stated that she and her husband simply were not able to carry that type of large payroll. Judy also admitted that on a number of jobs before the three jobs here, that Jim Murray had to borrow money from time to time to meet his payroll. These borrowings were usually obtained at banks.

While the three jobs involved in this appeal were in progress, Jim Murray was admitted into the hospital for open-heart surgery. His admission was on November 2, 1990. The heart surgery was performed on November 7, 1990. Crest contends that on November 7, 1990—the same date as the open-heart surgery—that Murray's crews stopped and ceased performance on the three jobs, thereby requiring Crest to assume responsibilities for completion of the concrete portions of each job—at least so contended Crest.

Crest further contends that while Jim Murray was recuperating from the open-heart surgery, a law firm that represented the Murrays sought payment from Crest of additional monies on the three jobs. Admittedly Crest resisted the demands. Crest maintained that until the jobs were completed or substantially completed, Crest could not determine whether there would be cost overruns on the concrete work.

Sometime in the month of January, 1991, an agreement was reached and accurate, unambiguous, definite documents were executed in January of 1991, which related to the "Beaumont Job". A complete, integrated, final, all-inclusive settlement agreement was reached, executed, and concluded on all issues and disputes concerning the "Beaumont Job".

These documents were prepared and the language was drafted by Hon. Mike O'Donnell, who represented Jim Murray. The record reflects that Crest had received definite

bids from Murray on all three jobs. But Crest had to complete the "Beaumont Job", the "Borden Job", and the "Cooper Job". Crest maintained that if a sub-contractor walks off a job and fails to complete a job, then Crest has to assume the job and complete the same, and at that point in time Crest does not know and cannot know whether the sub-contractor bid the job too low or whether the sub-contractor had plenty of money in the job and plenty of profit in the job.

According to Spurlock, President of Crest, on the three jobs that Crest completed, it cost Crest more to complete the jobs than what Murray had left coming and that was the basis for Crest petitioning for and seeking money damages from Murray on the "Borden" and "Cooper Jobs".

Crest stoutly claimed that Murray was paid on a monthly basis. This position was one of Crest's main theories of defense. There were times, however, when Crest paid Murray weekly if Crest had additional, extra money available. Crest claimed these weekly advances for Murray's payroll needs were voluntarily and gratuitously made; Crest maintained that Murray had no legal right to weekly payments. Indeed, Crest insisted through Spurlock that it was not Crest's obligation to pay Murray on a weekly basis— it was a favor. Crest argued that its only obligation was to pay Murray on a monthly basis in accordance with the terms of Crest's own contract with the owner of the job or project. Crest received only monthly payments for its work. Crest argues the "Borden" and "Cooper Jobs" were not worked on long enough by Murray; nor were they substantially completed. No compromise or settlement was reached as to these two jobs.

### The "Beaumont Job" Settlement Agreement

An unsecured note was dated January 14, 1991. The maker was Crest, a Texas Corporation, the payee was James E. Murray d/b/a Murray's Construction Co. The principal amount was $36,000.[3] There was to be no

3. **UNSECURED NOTE**
 Date: January 14, 1991

Maker: Crest Construction, Inc., a Texas corporation

interest paid on the unmatured principal. The annual rate of interest on *matured and due* but unpaid amounts was contracted for at 18 percent per annum.

But, the paramount terms of payments of principal and interest provided that "the principal amount of this Note *is due upon the date of final payment to Maker by CCI on the Southeast Texas Rehabilitation Hospital Project Job in Beaumont, Texas*. (emphasis added)" Thus the principal amount was not even mature or due until the final payment (including retainage) was made to the maker by CCI. The note was signed by Brad Spurlock, President of Crest, and was accompanied by a letter dated January 14, 1991, prepared by Murray's attorney of record, O'Donnell. The letter is very explicit and set out in toto below. It recites that this letter is to memorialize an agreement by and between Crest and Murray to resolve any and all differences and disputes that have risen between them with reference to any of Murray's claims for unpaid funds for work performed by Murray on the "Beaumont Job".

> Maker's Mailing Address (including county):
> 26415 Oak Ridge Drive, Spring,
> Montgomery County, Texas
> Payee: James E. Murray, d/b/a Murray's Construction Co.
> Place for Payment (including county):
> 29822 Twisted Oaks, Springs, Montgomery County,
> Texas, 77381
> Principal Amount: $36,000.00
> Annual Interest Rate on Unpaid Principal from Date: None
> Annual Interest Rate on Matured, Unpaid Amounts: 18%
> Terms of Payment (principal and interest): The principal amount of this Note is due upon the date of final payment to Maker by CCI on the Southeast Texas Rehabilitation Hospital Project Job in Beaumont, Texas.
> Maker promises to pay to the order of Payee at the place for payment and according to the terms of payment the principal amount plus interest at the rates stated above. All unpaid amounts shall be due by final scheduled payment due.
> If Maker defaults in the payment of this note, and the default continues after Payee gives Maker notice of the default and the time within which it must be cured, as may be required by law or by written agreement, the Payee may declare the unpaid principal balance and earned interest on this note immediately due. Maker and each surety, endorser, and guarantor waive all demands for payment, presentations for pay-

The breaches of the contract by both parties of the Beaumont agreement as well as the tortious interference of Judy, considering their simultaneousness or contemporary status, under this unique record eviscerate, we perceive, the question of which party committed a fault or a breach or a tortious interference first. The breaching actions of the parties were very close in time.

But Spurlock finally agreed under vigorous cross-examination that when he signed the letter of January 14, he contemplated that he would pay the sum of $36,000. We find in the record:

> A At the time we got paid.
> Q Immediately before—immediately before the payment to Crest, correct?
> A That's what it says.
> Q Is that what you meant?
> A It was supposed to be the same day. We were supposed to get our check. We were supposed to pay them.
> Q Immediately—as soon as Murray was paid, then CCI would pay you?
> A That's correct.

> ment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.
> If this note is given to an attorney for collection, of if suit is brought for collection, or if it is collected through probate, bankruptcy, or other judicial proceeding, then Maker shall pay Payee all costs of collection, including reasonable attorney's fees and court costs, in addition to other amounts due. Reasonable attorney's fees shall be 10% of all amounts due unless either party pleads otherwise.
> Interest on the debt evidenced by this note shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has bee paid, refunded. On any acceleration or required or permitted payment, and such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this and all other instruments concerning the debt.
> Each Maker is responsible for all obligations represented by this note.
> When the context requires, singular nouns and pronouns include the plural.
> Crest Construction, Inc.
> By: /s/ Brad Spurlock, President
> Brad Spurlock, President

But prior to this moment in time Spurlock had made it clear to Judy that he would not pay the $36,000 note. He would only pay $28,000 and shortly thereafter he even reduced that amount. The record clearly proves and Spurlock actually admitted on the stand that as to certain jobs, being the "Borden" and "Cooper Jobs", that Spurlock gave some aid and assistance to and for lien claimants to file claims in the probate court against the estate of James Murray, deceased, and Spurlock further unequivocally admitted on the stand that he either wanted or was willing to receive the money to cover these claims against the James Murray estate with the explanation that his ultimate intent was just to see that all the claims against the "Borden" and "Cooper Jobs" were paid either by and through Crest or through the independent executrix of the estate of James Murray, deceased.

The record reveals from Spurlock:

A I sent you a letter stating we would pay 28,000–some dollars.

Q And that constituted not only offsets on the Beaumont job, *but offsets on the Bordon [sic] job and the Cooper job?*

A *That's correct.*

Q Okay. I am sorry. You had offered— what was that?

A 28,000 some-odd dollars. We took approximately 8,000 off for three items.

Q They were deducts for Beaumont, right?

A Yes.

Q And what were the deducts you were taking off for Beaumont?

A The deducts for Bordon [sic]—for Beaumont was for 2800 and some dollars for work we had had to patch on a floor slab that we did not know—

Q Okay. Let's talk about that for just a minute. You had to patch a slab, right?

A Correct.

Q When was that slab poured?

A Probably poured in August or September.

Q Okay. . Well, that's back when you were supervising the job, correct?

A Correct.

Q Okay. Did you go over and look at the slabs as they were poured?

A We looked at the slabs and we had no indication it had to have repour work.

Q Is it true that Mr. Murray called you and told you it had rained during one of the pours and that there was a problem?

A No.

Q Never did?

A Never did.

Q Would it be fair to say—let me ask you this—after November the 7th, when Mr. Murray walked off the job, between that date and January the 14th, the day of this letter, in that two-month-and-a-week period, did you go over and look at the job?

A Yes, we did.

Q Look at it carefully?

A We looked at it, yes.

Q And after looking at it carefully and being the owner of a construction company, you couldn't find any problem with the slab, could you?

A The problem—oh, no, I could not.

. . . .

Q In addition to the deducts that you have wanted to take in April of '91 on the Beaumont job, *you wanted to deduct money on the Cooper job?*

A *Correct.*

Q *How much did you want to deduct on the Cooper job?*

A *2300 and some dollars, which is the amount you have on your letter.* (emphasis added)

But of paramount cogency and relevancy we find in the record:

Q All right. I want to make sure because I think I was confused. But I want to be sure. *You knew, on January the 14th, the day that you signed this agreement and promissory note, this agreement which we have had up, which is marked as Plaintiffs Exhibit 15, you already knew that there was a problem with the slab, right?*

A *Yes.*

Q Okay. Is there anything, any word in that agreement that says, Murray will pay for the problem with the slab that you already knew about?

A It says, Crest Construction will pay for or has paid all material costs and all labor costs incurred after November 7th. This was incurred before November 7th.

Q Oh, it was?

A Yes.

Q Show me on your sheet where you paid that 2800 dollars?

A He poured the concrete before November 7th.

Q Oh, I see. So its kind of a trick thing?

A It was not determined until later.

Q Well, when was—let's read this. Crest Construction will pay or has paid material costs attendant to the job and all labor costs incurred from and after November the 7th of 1990. When did you send the crew out to fix the problem with the slab? Before or after November the 7th?

A After.

Q Okay. And it was a company that did the work?

A It was a company that did the work. They fixed the slab. It was a company called Ballard's. Patched the slab.

Q *One other thing in the letter, maybe this is confusing. But doesn't it say this agreement constitutes a full and final settlement of all claims between the parties?*

A *Yes, it does.*

. . . .

Q *(By Mr. Ferebee) Is it not a fact, Mr. Spurlock, that after you told Mrs. Murray that you weren't going to pay her—that you would only pay 28,000, that you later came back and said you would only pay 27,900 before—you changed the number—before the end of April 1991? To 27,900 from 28,000?*

A *Uh-huh. I said approximately 28,000.*

Q Okay.

A Out of a hundred dollars is pretty close. (emphasis added)

Thus, Mr. Spurlock, President of Crest, once again wrongfully changed his position as to the balance left due and owing to Judy on the $36,000 note. As pointed out and discussed above, neither Spurlock nor Crest had any right to take these deductions. The Beaumont agreement was complete, separate and apart, and stood alone. The record also clearly reflects that one of the O'Donnell letters written to Spurlock informs him of the sums and bills that are outstanding on the three jobs. But Spurlock did not bring these up and did not insist upon them and went ahead and signed all the documents concerning the Beaumont settlement agreement.

As to the "Beaumont Job" the parties agreed as follows: (1) Murray will execute and deliver to Crest a lien waiver to the "Beaumont Job"; and, (2) in exchange Crest will execute a non-interest bearing promissory note for $36,000 as settlement funds on the "Beaumont Job". *The letter specifically states that the unsecured note will mature upon receipt by Crest of its final payment on the "Beaumont Job" and that the principal amount of the note is to bear no interest until after final payment to Crest from CCI. If, however, the note was not paid upon receipt of the final funds due to Crest, then the principal amount will at that time begin to accrue interest at 18 percent per year.*

██ Also, it was agreed that Crest will pay or has paid all material costs on the "Beaumont Job" and all labor costs incurred on the "Beaumont Job" from and after November 7, 1990. *The letter itself constituted a full and final settlement of all claims between the parties including any lien claims claimed by Murray upon the "Beaumont Job".* The settlement agreement forbade and disallowed any type of lien claim or any filing thereof on the "Beaumont Job" by Murray. In the settlement Murray gave up and foreswore any and all lien rights whatsoever and the filing thereof on the "Beaumont Job". The $36,000 note was adequate consideration. Also a promise for a promise is legal consideration in Texas, as here.

The letter was signed and was accepted and agreed to by Crest and personally by

James E. Murray d/b/a Murray's Construction Co. and Murray's attorney. The acceptance and agreement to the letter was dated January 14, 1991.

■ As an integral part of the settlement of the "Beaumont Job", Jim Murray in return for that note executed a certain instrument waiving and releasing any lien claims against the "Beaumont Job". This was an absolute and irrevocable waiver and release. This waiver of lien was signed by James E. Murray during his lifetime and specifically recited that for good and valuable consideration the receipt and sufficiency of which was acknowledged and confessed that James E. Murray d/b/a Murray's Construction Co. waived and released any mechanic's lien or materialmen's lien or claims of lien that Murray has or purports to have on the "Beaumont Job" and on the real property and on the improvements of the "Beaumont Job".

Also, Jim Murray relinquished any type of claim, which he had at that time or hereafter in the future will or may have, on the above mentioned job or on the real estate on account of any labor performed or material furnished or to be furnished in the future or labor to be performed in the future by Murray. *The waiver and release covered everything, past, present, and future.* This release and waiver is drawn in very broad, all-inclusive terms that were sworn to and subscribed by Jim before J. Michael O'Donnell, a notary public for the State of Texas. The release and waiver signed on January 14, 1991, was limited to the job in Beaumont, Jefferson County, Texas. It did not affect in any manner the other two jobs.

Then, prior to his untimely demise, James E. Murray executed certain lien affidavits on the "Borden Job" and the "Cooper Job" located in Montgomery County, Texas. After his untimely death, these two lien claim affidavits were filed for record in Montgomery County. Jim himself never made or signed a claim or lien claim against the "Beaumont Job".

The appellant argues that only the negotiations on the "Borden" and "Cooper Jobs" continued. But, these negotiations on the other two jobs came to a halt when Judy Murray filed a lien claim affidavit on the "Beaumont Job" in the sum of $62,727. *Judy sent a copy of the lien claim to the general contractor.* CCI immediately stopped paying Crest the money CCI owed to Crest on the "Beaumont Job". The "Beaumont Job" was settled finally, fully, and completely and separately from the other two jobs. The record makes this abundantly clear.

Thereafter, an agreed judgment was entered on January 27, 1992, whereby CCI, being a third-party plaintiff, interpleaded and put into the registry of the court $71,509.51 and it was specifically agreed by all parties that Ms. Peggy Stevens, District Clerk of Montgomery County, shall retain such sums on deposit until the final disposition of this cause—referring to the case on appeal sub judice.

Judy was to take nothing from CCI and was to prepare and execute a release of the "Beaumont Job". The three attorneys of record approved the agreed judgment as to form. The well-written briefs for both parties on appeal are noted and deeply appreciated.

### The Jury Verdict Favorable to the Murrays

It is also noted that the trial court submitted certain questions and instructions germane and favorable to Judy Murray on several different theories: (1) Justification as an affirmative defense to Crest's tortious interference claims; (2) excuse for failure of performance as an affirmative defense on the "Borden" and "Cooper Jobs"; (3) breach of contract by Crest on the "Borden" and "Cooper Jobs"; (4) breach of contract by Crest on the "Beaumont Job"; and importantly (5) a theory of recovery based solely on quantum meruit on the "Borden Job" and the "Cooper Job" plus a pleading for attorneys' fees for Judy Murray.

### The Appellant's Points of Error One and Two

■ The appellant briefs points of error number one and two together, which is appropriate. Point of error number one argues that the trial court erred in overruling

Crest's post-trial motions pertaining to jury question number one because the evidence establishes intentional interference by Judy as a matter of law; point two charges error in overruling the post-trial motions of Crest pertaining to question number one because the jury's failure to find intentional interference is so clearly against the great weight and preponderance of the evidence as to be manifestly unjust.

The initial litigation was brought by Crest when Judy Murray filed a lien claim against the "Beaumont Job" thereby stopping Crest from being paid further monies by CCI, the general contractor. In view of the wording and the language of the waiver and release on the "Beaumont Job", sworn to and acknowledged by James E. Murray, before his own attorney, we conclude that point of error number one should be sustained.

Without criticism of anyone and with due deference to both sides and their able attorneys, we think it is clear from the documentary evidence that the wording of the waiver and release is such that the later filing of the Mechanic's and the Materialmen's Lien Affidavit by Judy on the "Beaumont Job" and the sending of the same to CCI by Judy amounted to an intentional and tortious interference with an existing contract and existing rights that Crest had to receive substantial and large payments from CCI. As an alternative holding, we conclude that the answer to Jury Question No. 1, under this record, is against the great weight and preponderance of the evidence being manifestly unjust and clearly wrong. *See and compare Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931 (Tex.1991); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex.1989).

There existed a valid and legal contractual arrangement and a formal contract relationship between Crest and CCI. The interference of Judy was intentional rather than accidental. Crest failed to receive monies due because of the filing of the lien by Judy on the "Beaumont Job". Crest would have, under the contractual arrangements, been paid something in excess of $71,000 about the middle or end of April, 1991.

It is undisputed that after her husband's death, Judy Murray executed under oath a lien claim affidavit on the "Beaumont Job". She asserted a large debt—much larger than $36,000. In fact, the lien debt she asserted was some $26,700 over and above and in excess of the agreed settlement amount of $36,000, Judy's lien claim on the "Beaumont Job" being in excess of $62,000. Because of the plain, clear provisions of the Beaumont settlement agreement, Judy simply had no right whatsoever to file the $62,000 lien claim.

As we understand the record, it is manifestly proved that Crest has not received any of the $71,000 plus to this day. Crest has lost the use of these funds and is thereby clearly damaged. Among other damages, Crest is entitled to a day in court to show its damages subject to Murray's recoveries, if any, as offsets or credits against Crest's recoveries. Query: Should not the litigants with the greatest damages prevail after offsets and credits are properly judicially determined and ordered?

To Jury Question No. 2 the jury found that Murray was justified in filing the lien for approximately $62,000 on the "Beaumont Job". The instruction with the question was that "[a] person is justified in interfering with another contractual's relations if it is done in a good faith assertion of legal rights." Crest attacks the justification on two grounds. Firstly, Murray had no legal rights. We agree neither Jim nor Judy had any legal right to file the Mechanic's and Materialmen's Lien against the "Beaumont Job". Jim had bargained away his legal rights to assert or file a lien claim on the "Beaumont Job". No legal justification existed; we agree with Crest. Jim was represented by legal counsel. Jim's lawyers prepared the Beaumont settlement documents. We perceive Crest had no legal assistance. We sustain points of error one and two.

### Appellant's Points of Error Three and Four

In addition to the lack of proper pleadings, appellant says that there was no evidence of justification. Again, we agree. The defense of justification is an affirmative position. *See Sterner, supra,* 767 S.W.2d at

690. Judy Murray's live pleadings, inter alia, were her first amended answer, counterclaims, and third amended third-party claim filed June 29, 1992. Judy's amended pleadings did not plead justification as such.

In fact, in her answer Judy asserts that the plaintiff Crest should not be allowed to claim any offsets or credits on the "Beaumont Job" because the $36,000 promissory note disposed of any potential offsets. Thus, Judy ratifies the Beaumont settlement as a complete and final settlement agreement. Judy cannot blow hot and cold at the same time. Judy as widow and as Independent Executrix of James' estate filed an action against Crest and Brad Spurlock, individually. The pleadings of Judy are lengthy and pleaded approximately 10 or 11 separate causes of action.

■ The attorney for Judy on crucial points took the position that Crest could not read or directly quote from the pleadings of Judy. This was plainly erroneous. Pleadings are serious statements made by the parties and of compelling probative value if that party's pleadings are now adverse to or inconsistent with that party's contention at trial. Here, as shown above, Judy authorized her attorneys to draft and file her pleadings. A stipulation exists to that very effect.

■ Indeed, the pleadings in a particular case, for the purpose of use in that case, are to be regarded as formal judicial admissions rather than mere ordinary admissions if the same are hostile or inconsistent to that same party's contentions and position at the trial on the merits. 2 C. McCormick & R. Ray, Texas Law of Evidence Civil and Criminal §§ 1144, 1145, 1146 (Texas Practice 2d ed. 1958). And the allegations and statements made by the party's authorized attorney are that party's statement.

■ Even pleadings of a party in other causes of action which contain statements inconsistent with that same party's present position are receivable and admissible as admissions. Interestingly and in accordance with irrefutable logic, even when a pleading is abandoned, superseded or amended, such a pleading is deleted as a formal judicial admission. Such a pleading no longer actually binds the pleader in the sense that that pleading litigant is prevented from disputing or explaining away the facts set out in the superseded pleadings.

■ Nevertheless, these "unlive" pleadings remain forceful as an important crucial statement once seriously made. Hence, like any other utterance or statement, if the abandoned pleading is inconsistent with the party's (here Judy's) present position at trial, then the abandoned pleading is admissible and receivable into evidence as an admission and this rule is recognized even though the "dead" pleading is not verified and bears no filemark. This principle has been observed as a basic rule of evidence for a lengthy time in the Texas Practice. *See* Tex.R.Civ.Evid. 611(b), 613(a), (b), 801(e)(1), (2).

The alleged facts in Judy's live petition are quite lengthy. In the transcript we find no further pleadings by way of rejoinder from Crest. We do discover a very short pleading for Brad Spurlock.

■ In any event, we can find no special exceptions by Crest attacking Judy's ten separate and distinct causes of action plus her long, alleged, factual recitations and her extensive narrative. Judy is entitled to all reasonable intendments flowing from all her live pleadings. Therefore, we overrule appellant's point of error three as to its contention of no pleadings. We find the *justification pleadings sufficient, though barely so.* But there was no justification in the evidence.

■ Jim Murray and his attorneys agreed to accept an unsecured note in full, complete substitution for any and all of his claims and lien claims or rights to file same. Therefore he had no lien claims on the "Beaumont Job" and he could not reassert or file a lien claim on the "Beaumont Job". The release, waiver, and settlement documents eliminated future rights to file a lien claim or other type or form of security claim.

The consequences of the settlement put Jim Murray in a position where his legal remedies were to sue upon the note or the breach of the Beaumont settlement—not the

filing of a lien claim. His estate succeeded to no greater legal position. This holding is buttressed and reinforced dramatically by the fact that the note of Crest signed by Brad Spurlock payable to James E. Murray provided the payment of both principal and interest specifically stated that the principal amount of this note is due upon the date of final payment to maker by CCI on the Southeast Texas Rehabilitation Hospital Project Job in Beaumont, Texas. The "final payment" has never been made to Crest. We sustain appellant's point of error four on the basis that there is "no evidence" and there is "no legal evidence" to support the jury's finding. In the alternative, we find that such jury answer is definitely so against the great weight and overwhelming preponderance of the evidence as to be clearly wrong and unjust.

### Appellant's Point of Error Five: The Excluded Examples and Forms of Previously Signed Sub–Contracts Between Crest and Jim Murray

■ Appellant argues that the court below fell into error in failing to admit into evidence Plaintiff's Exhibit Nos. 2, 7, and 13 because these exhibits were relevant to ultimate and controlling issues in the case. These proffered but refused plaintiff's exhibits were certain written documents dealing with contract provisions and with sub-contract terms between Crest and Murray. The same were dated and signed by Crest. Murray did not sign the same. He did not refuse to sign them. The circumstances could have explained delays. Because of the state of the record and because there were no fully signed sub-contracts on the three jobs, a paramount, disputed issue arose between the parties as to when Crest was obligated legally to make advanced, weekly payroll payments to Murray on the three jobs germane to this litigation.

The basic position of Murray was that there was an *oral agreement which made it mandatory and legally obligatory upon Crest to make weekly payroll payments on the three jobs.* Crest on the other hand asserted that it was to pay Murray only on a monthly basis in accordance with the usage,

procedure, and custom that Crest and Murray had utilized for many years—and excessively relevant under many past sub-contracts. Crest has not taken the position and does not now argue that the sub-contract forms are admissible as such as completely executed and delivered sub-contracts.

Under this record and under the course of dealing between the parties approximating about nine or ten years, these excluded exhibits had hegemonic relevancy. The concept of relevancy is clearly set forth in the Tex.R.Civ.Evid. 401. Rule 401 contains the definition of "relevant evidence". " 'Relevant Evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

These partially executed sub-contracts certainly make the existence of the position of the parties as to when progress payments were to be made more probable in favor of Crest and less probable as against Murray than the sub-contracts would be without their introduction into evidence. They are relevant. They have a strong tendency to prove the existence of a fact of ultimate consequence. Rule 402 reads: "All relevant evidence is admissible, except as otherwise provided by Constitution, by statute, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." Rules 402 and 403 do not exclude these partially executed, dated, usual and proffered exhibits. Also, partial performance was executed on the same. Clearly, Murray's position was and Murray's evidence was offered to the effect that the usage and routine custom was that Crest sometimes paid Murray on a weekly basis. And, also Crest had promised weekly payments. Crest had the right to meet this vein or phase of the evidence; it was Judy's basic strategic offense.

Crest's strong rebuttal position was that these weekly payments were purely gratuitous in nature and were made to "help Murray out". The weekly payments were not based on contract nor were they based on any contractual obligation or duty. The sub-contract forms proffered showed that the sub-contractor, Murray, would be due a pay-

ment but only one payment on the 20th of each month, and only up to a certain percentage of the work done as certified by an architect. Murray was to be paid monthly only after Crest got its monthly payment from the owner. These provisions are and were usual.

Judy Murray acknowledged that such contract forms were definitely a part of the custom, usage or routine business practices in the past between Crest and Jim Murray. She had seen such an exact form about ten years ago and she had seen such forms used on a number of occasions. It is perceived that she recalled, if not admitted, that it was a routine, repetitious business practice of the Murrays during a job to refer to the sub-contract or to the sub-contract form for the purposes of determining the contract price and other important provisos.

Under these sub-contracts, it was excessively clear that the contract price was set out as an exact sum. And further, it was plain and unambiguous that based upon the determinations and certificates of the architect, the contractor Crest shall pay to the sub-contractor Murray on or about the 20th day of each month during the progress of the work, ninety percent of the portion of the contract price properly allocated to that portion of the work actually and correctly performed by the sub-contractor during the proceeding calendar month. Further, that the balance of the contract price (the retainage) shall be paid to the sub-contractor *within five days after the owner has made final payment to the prime contractor* of all sums retained by the owner from the progress payments.

Also, the sub-contract form provided that as a condition precedent to final payment, the owner may and could require the releases of liens from all persons to whom the sub-contractor may be indebted as a result of the work performed. Judy knew of this proviso. She may have acted upon it. The relevancy of these excluded exhibits is cogent and compelling. The same were relevant and material to an ultimate and paramount issue in the litigation; namely, when were the progress payments to be made to Murray and in what amounts and on what date and what the

retainages would be. We sanguinely sustain point five.

### Appellant's Points of Error Six and Seven

■ Crest's point of error number six argues that the court erred in overruling Crest's post-trial motions pertaining to Question No. 7 because Crest argues that the record establishes a breach of contract by Jim Murray as a matter of law on the "Borden" and "Cooper Jobs". Question No. 7, in substance, asks did James E. Murray breach his sub-contracts by failing to provide and pay for all of the labor and materials on the "Borden" and "Cooper Jobs". Murray clearly did not so pay. These jobs had to be completed by Crest. The instruction was "lack of performance may be excused where the same contract has been previously and materially breached by the other party." The jury answered, "No."—that James Murray had not breached his sub-contracts on the "Borden" and "Cooper Jobs". But the jury did not have the form of the sub-contracts before it for the jury's consideration. Error is shown; this Question No. 7 must be retried on remand.

■ Crest says that the record and the evidence establishes a breach of contract by Jim on the "Borden" and "Cooper Jobs" as a matter of law. We tend to definitely agree. Jim simply did not conclude these two jobs. And in point of error seven, Crest says that the finding of the jury is clearly against the great weight and preponderance of the evidence so as to be manifestly unjust. But we find the answer to Question No. 7 was against the great weight and preponderance of the evidence. In the interest of justice, we conclude Question No. 7 must be retried. The retrial turns on whether Crest *had to make weekly progress payments*; this was a hotly contested issue of supreme impact. The jury did not have the forms of the sub-contracts to consider, which ruling, in itself, was erroneous.

### Appellant's Point of Error Eight

■ We sustain appellant's point of error number eight. In point of error number eight the jury found *that Crest was not*

*entitled to any attorney's fees whatsoever.* A court of appeals has jurisdiction to review a jury's negative finding. Question No. 12 submitted to the jury the issue of Crest's attorney's fees. The jury answered "0". *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646 (Tex.1988); *Austin v. Truly,* 721 S.W.2d 913 (Tex.App.—Beaumont 1986), *aff'd, Truly v. Austin,* 744 S.W.2d 934 (Tex.1988); *Davis v. McQueen,* 842 S.W.2d 376 (Tex.App.—Beaumont 1992, writ denied). Crest had a right to claim attorney's fees subject to offsets and legal counterclaims. Additionally, the answer of "0" is against the great weight and preponderance of the evidence so as to be clearly wrong and manifestly unjust.

### Appellee Judy Murray's Testimonial Concessions on the Crucial Terms of the Sub–Contracts Whether Oral or Written

■ It is noteworthy and significant that the appellee, in her brief, concedes that there was conflicting testimony at trial concerning the terms of sub-contracts between Crest and Jim Murray. Further, appellee agrees that one of the critical issues was whether Crest had an *obligation or legally enforceable contractual duty* to make weekly payroll payments to Murray to cover labor or whether Crest had no such duty or obligation to make such weekly payments. Appellee further concedes that Spurlock, as president of Crest, claimed that there was no agreement to pay and advance weekly labor costs.

Under this record, the sub-contract forms were piercingly relevant and materially admissible especially in view of the facts of the long-standing business relationships and customs that existed between the parties including the completely signed, written sub-contracts.

Also, appellee's brief concedes that Murray began work on the "Beaumont Job" in March of 1990 and began work on the "Cooper" and "Borden Jobs" in October of 1990, and that Jim Murray, during his lifetime, partially performed the work in a reasonable, satisfactory manner. However, appellee argues that Crest failed to advance the payments needed to cover the weekly labor costs so it was conceded by appellee that Jim Murray was unable to continue or complete the works. But whose fault was it? Queries: Who breached the sub-contract first? Who breached the sub-contract materially? Were the breaches simultaneous or nearly so? Who committed the gravest, most damaging breach? In fact, appellee agrees that on November 7, 1990, Jim Murray notified Crest that he had no alternative but to cease work. Jim Murray walked off the three jobs; the record clearly establishes these "walk-offs". Jim had to. His health was greatly impaired. We decry that the law is so primitive and, in cases, brutal that open-heart operations and disastrous strokes are not defenses. Even so, Judy has not so pleaded or submitted appropriate jury questions thereon.

The Murray interest avers that Jim Murray was forced off the jobs even though *he had completed sixty percent of the "Borden Job" and more than thirty-five percent of the "Cooper Job" and ninety percent of the "Beaumont Job". Judy Murray argues that Crest had only paid Jim Murray twenty-five percent of the "Borden Job" and nothing on the "Cooper Job". She then vehemently argues that since Jim Murray had performed satisfactorily on the "Beaumont Job" that Jim was due $62,727 which Crest wrongfully refused to pay.* Interestingly, appellee definitely concedes and agrees in her brief that CCI still owed its final retainage plus other payments to Crest on the "Beaumont Job". But this money was placed in the registry of the court; Crest did not receive this money in its hands. Appellee agrees. · Appellee states in her brief:

> "In January of 1991, a settlement agreement was reached on the Beaumont Job, but the Borden and Cooper Jobs were not substantially complete and no compromise was reached as to them." Appellant's Brief at 7. The settlement agreement was in writing, in the form of a letter agreement signed by Brad Spurlock and Jim Murray.... The agreement also provided that Jim Murray would execute a *lien waiver on the Beaumont Job.* (emphasis added)

Appellee agrees that the settlement agreement was in several writings and one writing

was an important, governing part in the form of a letter agreement signed by Brad Spurlock and Jim Murray. The important letter is contained in Plaintiff's Exhibit No. 15. The letter agreement is written on stationary of O'Donnell, Ferebee & McGonigal P.C. The letter reads:

January 14, 1991

Mr. Brad Spurlock
Crest Construction Co.
26415 Oak Ridge Drive
Spring, Texas 77380

 Re: James E. Murray, d/b/a Murray's Construction Co.

Dear Mr. Spurlock:

This letter will memorialize an agreement by and between Crest Construction, Inc. and Murray's Construction Co. to resolve the differences and disputes that have arisen between them with reference to Murray's claims for unpaid funds for work provided by Murray on the Southeast Texas Rehabilitation Hospital Job in Beaumont, Texas.

In order to resolve these disputes, and to buy peace, the parties agree as follows:

1. Murray will execute and deliver to Crest Construction, Inc., upon execution of this Agreement, a Lien Waiver to the job.

2. In exchange, Crest Construction, Inc. will execute a non-interest bearing Promissory Note, for $36,000.00 as settlement funds on the Beaumont Job.

The Note will mature upon receipt by Crest Construction Inc. of its final payment on the job. The principal amount of the Note will bear no interest provided it is paid within that period of time. If it is not paid upon such receipt of funds by Crest, the principal balance will begin to accrue interest at 18% per year. The Note will be on a standard "State Bar of Texas" form and contain no other provisions other than as set forth in this letter agreement. In addition, as to the Beaumont Job, we will provide Zip Cosimi with a copy of this letter, and direct him to deliver final pay-

ment to Crest at such time as Murray acknowledges receipt of payment by Crest.

3. Crest Construction, Inc. will pay, or has paid, all material costs attendant to the job, and all labor costs incurred from and after November 7, 1990.

4. This letter Agreement constitutes a full and final settlement of all claims between the parties attendant to lien claims of Murray upon the Beaumont Job.

If the above and foregoing conforms with our agreement, please so signify by signing where indicated at the foot of this letter and on the Note. I will then have Mr. Murray sign a duplicate original of the letter and provide it to you for your file, together with a Lien Waiver.

Very truly yours,
O'Donnell, Ferebee & McGonigal, P.C.

/s/ J. Michael O'Donnell

ACCEPTED AND AGREED:
CREST CONSTRUCTION, INC.
By: /s/ Brad Spurlock
 Brad Spurlock, President
Date: 1–14–91
ACCEPTED AND AGREED:
JAMES E. MURRAY, d/b/a MURRAY'S CONSTRUCTION
By: /s/ James E. Murray
 James E. Murray
Date: 1–14–91

Noteworthy is the fact that the letter completely memorializes the agreement. It was also signed by J. Michael O'Donnell. This able, distinguished lawyer represented the Murrays throughout. Crest and Spurlock had no attorney—at least none is evident. It is agreed by James E. Murray that to resolve the disputes and to buy peace Murray will execute and deliver to Crest upon execution of this agreement a lien waiver to the "Beaumont Job"—and in exchange Crest will execute an unsecured, non-interest bearing promissory note for $36,000 as settlement in full on the "Beaumont Job". But, adverse to the interest and position of Murray, the note will mature only upon receipt by Crest of its

final payment on the "Beaumont Job". But Jim with legal counsel so agreed. To date Crest has not gotten its final payment in its corporate hands. Crest cannot exercise realistic dominion over the $71,000 plus in the court's registry. *See* Footnote No. 3, the Unsecured Note.

Thus, we conclude that Murray's argument proceeds in a circle. Jim Murray is to contact Zip Cosimi (CCI's general superintendent of the "Beaumont Job") and direct him to deliver the final payment to Crest at such time as Murray acknowledges the receipt of payment of $36,000 paid by Crest. In brief, Murray does not get its money until after Crest gets its final payment, yet very inconsistently, Murray is to acknowledge receipt of payment by Crest. Thus an unfathomable labyrinth was created partially by Murray. An impossibility arises unless simultaneous, crucial events coincide and co-exist. Zip Cosimi was to be favored with a copy of the O'Donnell letter agreement dated January, 1991, directing Cosimi to deliver the final payment to Crest. Of crucial significance is the unambiguous proviso in that letter that:

> This letter Agreement constitutes a full and final settlement of all claims between the parties attendant to lien claims of Murray upon the Beaumont Job.

But somebody was not telling the truth. Cosimi unequivocally swore that Spurlock told him (Cosimi) that Murray was a direct employee of Crest. Cosimi had informed Spurlock that CCI did not want their undercontractors to, in turn, sublet work to sub-subcontractors. The use of sub-subcontractors such as Murray was definitely against CCI's corporate policy. Cosimi's language and its directness rings of the truth in a clarion manner.

Undoubtedly, Murray had some disputes concerning the two other jobs, that is, the "Borden Job" and the "Cooper Job", and could have sued upon the same and did sue upon the same and had a right to sue upon a $36,000 note or a breach of the Beaumont settlement.

But we are constrained, because of the various documents constituting the settlement, to hold that the Murray interest—neither James nor Judy—had any right to file lien claims against the "Beaumont Job". The Murrays simply gave those rights up—maybe unwisely—but definitely and irrevocably.

The settlement agreement on the "Beaumont Job" and the actions of Judy later in filing a lien thereon with copies to CCI establish and indeed constitute a tortious interference with the lawful contractual rights and contractual relationships between Crest and CCI. Thus a tortious interference (committed by Judy personally through her lawyers) is established as a matter of law. Also, the settlement documents on the "Beaumont Job" convince us that regardless of disputes and arguments about the "Borden" and "Cooper Jobs"; that, nevertheless, these "Borden" and "Cooper" arguments, disputes, and contests did not vest in Judy any legal right, certainly not any legal rights exercised in good faith, to file the large lien as a Mechanic's and Materialmen's Lien against the "Beaumont Job".

The "Beaumont Job" agreement was separate and apart from the other jobs; it was independent and unconnected to the other two jobs.

A very basic thrust and fundamental argument of appellee is this:

> CCI owed its final retainage to CREST on the Beaumont Job. However, Jim Murray had the right to file a mechanic's lien on the property because CREST still owed him for work performed.

Jim Murray did *not* have the right; he gave it up. Crest may or may not have owed Jim for work performed on the "Beaumont Job"; but, nevertheless, Jim Murray definitely, unequivocally, and unambiguously gave up the right to file any such mechanic's lien.

The appellee, in her brief, affirmatively states and concedes, "The settlement agreement was in writing, in the form of a letter agreement signed by Brad Spurlock and Jim Murray." Appellee's contentions are inconsistent—indeed, hostile and mutually destructive.

The letter states Murray will execute and deliver to Crest a lien waiver to that job and Jim Murray did so. Appellee makes no at-

tack on the settlement agreement; appellee fails to allege or assert fraud, accident, mistake, mutual mistake, duress, or any other infirmity to the note or the settlement. None of these defensive matters are advanced by the Murray interests.

Therefore, even if Jim Murray's claims were in an amount greater than $36,000, those additional claims, if any existed, were settled out and clearly given up completely by Jim. Again the appellee admits that no agreement was reached on the "Borden" and "Cooper Jobs"—as distinguished from the "Beaumont Job" where a full and final agreement existed. The Murray interests directed the filing of certain liens on the "Borden Job" and the "Cooper Job" on February 26, 1991. The lien on the "Borden Job" was for $7,104 and the lien on the "Cooper Job" was for $6,129.50.

Thereafter, Mr. Murray passed away—a very regrettable calamity. However, Crest countered and claimed that it owed no money to Jim Murray for work done on the "Borden Job" and the "Cooper Job". And these issues should be retried on remand. Instead, Crest at least alleged and offered evidence that Jim Murray owed Crest money on these two jobs. These disputes did not affect the "Beaumont Job" top, side, nor bottom. The disputes on the "Borden" and "Cooper Jobs" certainly created no legal rights that could be exercised in good faith which would allow or permit Judy to file Mechanic's and Materialmen's Lien claim for over $62,000 against the "Beaumont Job" and thus cut off monies due to Crest from CCI.

Indeed, Crest took the position that it had some offsets and defenses to part of the $36,000 note. Crest was simply wrong and acted illegally.

Under the terms of the $36,000 note nothing at this time is actually due to Murray subject, of course, to this appeal and judicial proceedings. Appellee agrees that CCI was dismissed entirely from the case by an agreed judgment of all the parties and that the funds were retained and remained in the registry of the court, even to this date. Appellee clearly and voluntarily agrees to this arrangement. After the money was paid into the registry, Judy conceded that she agreed to release her lien on the "Beaumont Job" entirely and to then seek recovery from the funds in the registry.

### The Issue of Crest Violating the Beaumont Settlement Agreement

■ Very interestingly, and of crucial significance, is the jury finding to Question No. 16. Question No. 16 asked did Crest fail to comply with the Beaumont agreement of January 14, 1991, by refusing to pay $36,000 without claiming offsets. The jury was instructed that the law does not permit a party to deduct offsets on separate transactions except where there is an agreement of the parties or judicial action. The jury answered, "Yes."—that Crest did fail to comply with the Beaumont agreement. Indeed, Crest and Spurlock violated and breached that agreement as a matter of law. Murray can seek damages on this breach of the Beaumont agreement by Crest. Crest was likewise fully bound by the Beaumont agreement. It agreed to pay the $36,000 in full— not a lesser amount—not one cent less. Crest breached its part by demanding Judy accept the materially reduced sum of $28,000. Spurlock futilely attempted to justify this large first reduction arguing that certain bills due to be paid by Murray were not paid but all these sorts of issues and matters were settled fully. Spurlock also later claimed a non-substantial type of defect in Murray's cement work. But amazingly Spurlock actually knew of this defect before he signed the Beaumont settlement documents. Spurlock and Crest are as thoroughly bound by the Beaumont agreement as Judy is. Spurlock cannot blow hot and cold at the same time out of the corporate mouth. Thus, plainly, Spurlock and Crest violated the Beaumont settlement agreement as a matter of law; we so hold. Murray can seek damages therefor subject to offsets, if any, from other jobs.

Crest repeatedly through Spurlock refused to pay the $36,000 in full and still contends the $36,000 is not owing even if Crest had full possession of the $71,000 plus money even after such monies were fully released to Crest from the registry of the court. Crest argues that it had the right to offset its

losses from the "Borden" and the "Cooper Jobs" against the $36,000 amount owed as set out in the settlement. Crest had no such right of offset or credit because those issues and disputes were settled for $36,000 even money. Crest knew of the slab's defect and should have dealt with this defect as an exception to the settlement. Crest totally failed to reserve any reductions. Crest likewise broke the Beaumont agreement as a matter of law.

▇▇▇▇ Generally speaking, mutual debts do not extinguish each other and are not to be offset one against the other in the absence of agreement or determined by judicial action. *See Benton v. Wilmer–Hutchins Ind. Sch. Dist.,* 662 S.W.2d 696 (Tex.App.—Dallas 1983, writ dism'd). These alleged offsets arose out of claims made by Crest against Murray on the "Borden" and "Cooper Jobs". Nevertheless, the settlement provides that Murray was to get $36,000 in full from the "Beaumont Job", being an independent agreement and independent promissory note. The general rule is that payment of promissory notes must be made in money or the equivalent of money. *Muldrow v. Texas Frozen Foods,* 157 Tex. 39, 299 S.W.2d 275 (1957).

Crest may have possessed some right to recover on some of these claims of losses involving the "Borden" and "Cooper Jobs" but under the settlement agreement Crest had no right to attempt to offset them against the $36,000 note. But in any event, Crest concedes that it had the obligation to pay at least $28,000 (at first) in money after unilaterally, illegally taking an offset and credit of $8,000.

As we understand Crest's position, it unequivocally admitted it owed at least $28,000 to Murray. Query: Why didn't Crest pay it to Murray? Query: Why didn't Crest, at least, put it into the registry of the court? Crest wants and insists on the benefits conferred upon it by the settlement of the "Beaumont Job" and we agree Crest is entitled to said benefits. Crest must take the detriments of the settlement as well. Crest cannot have it both ways. Crest cannot have its cake and eat it too as to the Beaumont settlement agreement.

Under this record we have held that the Murray interest (both James and Judy) must live up to the unambiguous, clear provisions of the settlement agreement concerning the "Beaumont Job"; we now require the same from Crest. But Crest later claimed new, novel and additional illegal offsets.

### *The Quantum Meruit Issue Vis-á-Vis the Stipulated and Stated Contract Question*

The parties, through their attorneys as noted above, actually stipulated the contract price of both the "Cooper Job" and the "Borden Job". Note these prices were "contract prices". Therefore, we determine that Murray's rights as well as Crest's rights were based on contracts and contract prices and not on quantum meruit. Hornbook law makes axiomatic that when there is a contract, the quantum meruit theory of recovery, except in very rare, unusual cases is simply not available. No such unusual case exists here. No claim for extras exists.

Nevertheless, in Question No. 18 the jury was asked as follows:

Did Murray perform compensable work for Crest on the Borden and Cooper Jobs?

One party performs compensable work if valuable services are rendered or materials furnished for another party who knowingly accepts and uses them and if the party accepting them should know that the performing party expects to be paid for the work.

The jury answered, "Yes." This is a submission on the quantum meruit theory which we determine and hold to be unavailable in this case to the Murray interest. Murray admits this is an attempt to implicate recovery on quantum meruit; thus, reversible error exists. But this submission was egregious error, there was no way Crest could win.

▇▇▇ In Question No. 19 the jury was asked in substance, what is the reasonable value of such compensable work on the "Borden" and "Cooper Jobs" at the time and place the same was performed? The jury answered, "$17,670". We determine that that standard is not the correct measure of damages for breach of contract since the total contract price on each of these two jobs

was actually stipulated as definitely agreed *total contract prices.* The measure of damages for Murray would have been the *contract price* recoverable when the job was completed. If the costs of the completion was less than the contract price, Murray could recover the difference. If, on the other hand, after the job was completely performed, if the cost of performance by Murray and the cost of completion exceeded the contract price which was paid out by Crest, then Crest would be entitled to that excess amount of reasonable cost over the contract price.

Crest wanted to take a large offset in the amount of $8,000 plus based on a fax communication sent to Brad Spurlock by J. Michael O'Donnell dated February 5, 1991 [4], stating that the Murrays had advised O'Donnell that there were following billings that were outstanding on the three jobs. On the "Beaumont Job" only $116.61 existed; on the "Borden Job" about $3,542; and on the "Cooper Job" two invoices from Campbell Ready Mix totalling $1,984.50. Mr. O'Donnell enclosed the supporting billings or invoices. O'Donnell acted fairly and openly with Crest as to these matters. Crest should have paid, at the very least, $36,000 less $116.61 into the court. All these bills total $5,643.41 less than $8,000.

### Appellant's Points of Error Nine, Ten, and Eleven

■ In points of error nine and ten the appellant briefs and argues that the trial court erred in overruling Crest's post-trial motions and in permitting Murray to recover on a quantum meruit theory because there was an express contract and express contract price on both the "Borden" and the "Cooper Jobs" and there was simply no claims for extras asserted or demonstrated. We agree.

Point of error ten of appellant stressed that Murray could not recover on the theory of quantum meruit because the jury had found in answer to Question No. 15 that no sum of money was due and owing to Murray for any breach of contract by Crest on the "Borden" and "Cooper Jobs". Question No. 15 was erroneous.

We sustain appellant's points of error nine, ten, and eleven. These three points attack Murray's recoveries based solely on the theory of quantum meruit. Express contracts existed on the "Borden" and "Cooper Jobs". No claims for "extras" were pleaded or proven by the Murrays on the "Borden" and "Cooper Jobs". *See and compare Black Lake Pipe Line Co. v. Union Const. Co.,* 538 S.W.2d 80 (Tex.1976). *See also Austin v. Truly, aff'd, Truly v. Austin, supra; Davis v. McQueen, supra.* In fact, the Murrays allege and the record shows the firm existence of express formal contracts. Judy conceded that her husband did not complete the work contracted for on the "Borden" and "Cooper Jobs". The Murrays also allege that their claims are based on expected re-

4. February 5, 1991

Mr. Brad Spurlock
Crest Construction
26415 Oak Ridge Drive
Spring, Texas 77380
RE: James E. Murray, d/b/a Murray's Construction Co.
Dear Mr. Spurlock:
I have spoken with Murrays, and they have advised me that the following billings are outstanding as to the three jobs we have discussed;
1) Beaumont Job
—Invoice from Betco in the amount of $116.61.
2) Borden Job
—Shepler's $3,451.16
—Conroe Welding Supply Charges of 10/18/90 and 10/30/90 in the amount of $91.14
3) Cooper Job
—Two Invoices from Campbell Ready Mix, totalling $1,984.50
I am told there are no other outstanding or unpaid invoices which in any way relate to work by Murray on any of the projects. At such time as this is resolved, I will provide you with a written statement to the effect if you would like it for your files.
Please review the enclosures and the time records which I sent to you, and call me at your earliest convenience. I need to have this all resolved by the 15th of February and I would appreciate your prompt attention.
Very truly yours,
O'Donnell, Ferebee & McGonigal, P.C.
/s/
J. Michael O'Donnell
JMO/bk
Enclosures
4:JMO/CREST.LTR

munerations from the "Borden" and "Cooper" contracts. As set out above in this opinion, the dramatic stipulation in the record detonates and explodes the theory of quantum meruit. This theory is disallowed to the Murrays.

■ We also conclude that the breach of contract theory is the only viable one available to the Murrays for recovery of damages, if any, on the "Borden" and "Cooper Jobs". The Murrays probably would be required to show that the necessary, reasonable, and proper costs of the completed "Borden" and "Cooper Jobs" plus the amounts paid by Crest to the Murrays—that total amounted to less than the agreed, stipulated contract prices. If these sums were less than the contract price, Crest owes Murray money on the two jobs.

■ But if on the other hand, the necessary, reasonable, and proper costs paid by Crest to complete the two jobs plus what Crest had paid to Murray (before Murray walked off the jobs for serious health reasons) that total, if it exceeded the stipulated contract price would be recoverable by Crest. That is, the excess costs over and above the stipulated contract price would be breach of contract damages to Crest. Jim has our unlimited admiration for working on the "Beaumont Job" while in a wheelchair after a stroke. But our Texas law of the jungle on contracts fails to recognize this humanitarian defense.

■ We sustain these points of error and in view of our holdings and rationale in this opinion, we disallow the $20,000 awarded to the appellee herein for her attorney's fees since Judy has not prevailed here. That issue will have to wait another day. The legal fees of the parties can be balanced.

■ Likewise, the $2,000 additional attorney's fees in the event of an appeal to our Ninth Court of Appeals must await the final outcome of this litigation. In view of our ultimate reversal and remand, *the pre-judgment interest on the $36,000 at the rate of eighteen percent per annum from and after August 20, 1991 until the date of the judgment in the amount of $10,332.49 is disallowed* because of the very wording of the note itself and the undisputed facts in this record, including the Beaumont settlement documents. By the same token, the prejudgment interest on the recovery under the quantum meruit theory is disallowed; and the theory of recovery based on quantum meruit is simply not available to the Murrays. We so hold. Thus, the post-judgment interest at the rate of ten percent per annum is disallowed as is the post-judgment interest at this time on the $36,000 at the rate of eighteen percent per annum.

### Appellant's Point of Error Twelve

Appellant's point twelve is partially sustainable and partially unsustainable. The Murrays have a right to recover partial attorney's fees on Crest's and Spurlock's somewhat flagrant breach of the Beaumont agreement. Nevertheless, the Murrays cannot at this time recover attorney's fees and interest on the $36,000 note for the simple, but paramount, controlling reason that the note has not matured and is not now due and payable under its own terms. The note does not bear interest until after maturity. Jim Murray was not overreached in the settlement. Jim Murray's attorneys, who prepared all the settlement documents, prepared the note on the "Beaumont Job". Apparently, Crest did not avail itself of legal advice before signing the settlement documents. Murray's attorney's fees are subject to offset and counterclaims in order to strike a final balance on such fees between the parties.

### Appellant's Point of Error Thirteen

Appellant's point of error thirteen states that the trial court erred in submitting Jury Question No. 16, which pertained to the breach of the contract on the "Beaumont Job" because, appellant argues, there was insufficient evidence to support the submission of Question No. 16, because it was not a controlling issue, and because the accompanying instruction misstated the law. Question No. 16 reads: "Did Crest fail to comply with the Beaumont agreement of January 14, 1991 by refusing, if it did, to pay $36,000 without offsets?" The jury answered: "Yes."

As noted above, we hold Crest breached the Beaumont agreement. Crest was not empowered to rearrange or rewrite the Beaumont settlement agreement. Neither Crest nor Spurlock had the right to move the goal line and the goal post further back away from Judy's field position. Spurlock wrongfully claimed deductions and credits against the $36,000 note. Spurlock, at first, in a unilateral manner and without justification told Judy he would pay at the very most only $28,000 on the $36,000 note. Spurlock thoroughly breached the Beaumont agreement. Then, later he determined to take yet another deduction. No self-help of this type was available to Crest. The original $8,000 deduction—a substantial one to Judy—could only be made effective through proper and favorable judicial action.

Quite frankly, in reviewing the record it becomes painfully evident and obvious to us that these litigants were violating each other's rights and breaching each other's contractual duties, obligations, and benefits.

But to balance the equities and to arrive and ascertain right dealings and fair dealing between the litigants it must be said also that Judy unlawfully filed a $62,000 lien on the "Beaumont Job" which her husband had agreed to settle for an unsecured, unusually worded note. Thus Judy did not have the right to this sort of self-help. The litigants' damages will have to be retried and after proper offsets and counterclaims a correct, final legal balance must be struck. Question No. 16 need not be retried or re-submitted, just the resulting damages to Murray.

### Appellant's Points of Error Fourteen and Fifteen

 Murray's issues on attorney's fees will have to be retried. Prudence and careful trial techniques will dictate that the same shall be segregated, if practicable. The attorney's fees due to Murray, if any, on the "Borden" and "Cooper Jobs" should be segregated and ascertained separately and distinct from the Murray's proper attorney's fees, if any, on the "Beaumont Job". Crest, of course, is under the same mandate. *See and compare American Nat. Bank v. First Wis. Mtg. Trust,* 577 S.W.2d 312 (Tex.Civ. App.—Beaumont 1979, writ ref'd n.r.e.). The attorney's fees for Crest should be segregated as noted above. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1 (Tex.1991). Thus, in a partial manner and in a certain sense, we sustain appellant's points fourteen and fifteen in a limited manner. Appellant's points fourteen and fifteen argue that there is no evidence or insufficient evidence to support the submission of the issue of Murray's attorney's fees. As noted, the attorney's fees on the note itself are not mature. Murray's other law fees are choate and viable.

 But we stoutly disagree with Crest's dogmatic and over-broad contention that Murray can recover attorney's fees if, but only if, Crest is liable strictly under quantum meruit. We conclude that Murray can recover necessary, reasonable, and proper attorney's fees if Murray prevails finally on the "Borden" and "Cooper Jobs". Murray there has a right to sue for materials bought, furnished, and put in place. Murray can recover for labor performed. As explained above, Murray must prevail showing that there was a profit for Murray and Crest on these two jobs and this mandate and ruling applies equally to Crest.

Undeniably the "Beaumont Job" was handled entirely differently from the other two jobs. We have held with sagacity that both litigants have violated the Beaumont agreement. We opine that each litigant suffered damages from such breaches and the party with the greater damages can recover its or hers proper and correct measure of damages subject to proper legal offset. And by like reasoning each litigant can attempt to recover attorney's fees for the breaches of the "Beaumont Job" agreement. But as yet, Judy cannot recover attorney's fees strictly based on the $36,000 note.

 We have found error and we perceive that the error is serious, substantial, and reversible error in quality. We determine as noted above that reversible error exists because our Ninth Court of Appeals is of the opinion that the error complained of amounted to such a denial (of the rights of both of the parties on different issues to this appeal) that the same was reasonably calcu-

lated to cause and in probability did actually cause the rendition of an improper, erroneous judgment below. We find that such error is not remediable here by us. Tex. R.App.P. 81(b)(1).

Sincerely, we regret and we express real remorse in having to order a remand which remand must be conducted in harmony with this opinion, but we see no other alternative. Rule 81(b)(1). The respective counts for the various attorney's fees under this statement of facts are an element of each litigant's damage claims. Here we cannot sever the damage issues from certain liability issues as to the "Borden" and "Cooper Jobs". These should be submitted separately. We conclude the damage issues on the "Beaumont Job" can be retried without submitting the breaches of contract issues or the breaches of the Beaumont settlement agreement issues. We note that the case was properly on the jury docket and it remains so on remand.

Each litigant can retry the governing issues and disputes and contentions on the "Borden Job" and on the "Cooper Job". And initially, each party can make recoveries or sustain adverse fact findings or losses on these two jobs. Each party can attempt to obtain proper legal fees on the "Borden" and "Cooper Jobs". But then the court can strike the ultimate balance.

Interestingly and problematically, it may turn out that different parties will recover on different jobs. In other words, one party litigant may be a winner on certain jobs and a loser on other jobs. The future jury findings may present variable, several combinations of answers. Thus, there could be different prevailing parties on the three different jobs. Then, by reasonably correct and fairly impeccable judicial action, the trial court can work its way through the labyrinth, if one exists, after the jury's full verdict is returned or after the fact finders have determined the rights and recoveries and losses of the various parties—then the trial judge can in a fair, equitable, and just manner resolve such credits, monies due, setoffs, or counterclaims and offsets. Significant is the well-established rule that the rule of law that mutual debts do not extinguish each other in the absence of a clear agreement to the effect *or correct judicial action.*

We determine in view of the above opinion and the reversible error discovered that a remand is necessary. Therefore we reverse the judgment and remand the cause for a proceeding consistent with this opinion.

As a separate, independent, and distinct ground, for our decision and action having found error, we then, in the interest of justice, reverse the judgment and remand the cause. Excepted from the trial on remand is the issue of tortious interference on the part of the Murray interest as against Crest on the "Beaumont Job"; that is not to be retried. Thus, logically following, the issue of justification is not to be retried. As a matter of law, Judy had *no justification.* Murray is not to recover attorney's fees at this time on the note because the note under its own terms has not matured to the point that attorney's fees are recoverable, subject, however, to correct future judicial action. The counts of quantum meruit are not to be retried and recovery based on the theory of quantum meruit is disallowed.

Murray may try to recover and has a right to attempt to recover on remand any monies, if any, due to Murray on the "Borden" and/or "Cooper Jobs" based only, however, on a breach of contract theory, not on quantum meruit. And, likewise, Crest may attempt to recover on remand any valid damages elements Crest may have (and prevail upon) against Murray on the "Borden" and/or "Cooper Jobs" based on the breach of contract theory, provided, of course, that the cost of completing and concluding these two jobs exceeds the agreed contract price that was stipulated to by their attorneys. These recoveries may be offset against each other by proper judicial action.

The Murrays have the right on remand to retry any sustainable claims for damages because of the breach by Crest of the settlement agreement on the "Beaumont Job". Crest broke its agreement as against Murray concerning the "Beaumont Job". Crest breached that agreement as a matter of law. We so hold. Crest can, upon remand, try to establish damages, if any, resulting from Judy's filing of the lien, which we hold tor-

tious as a matter of law. Crest admits at least $28,000 owed on said note. But the awards and the losses and the resolutions of the disputes on the "Beaumont Job", we conclude, should be tried and separately submitted to the jury from similar issues on the "Borden" and "Cooper Jobs".

Crest does not possess or have the use of the funds deposited by CCI into the registry of the court at this date. Important and crucial is the course of dealing that Crest pursued as against Judy in regards to the deductions on the $36,000 note. Crest, more than once, knocked down the amount it would pay on the note and advised Judy of these unlawful reductions. Thus, Crest, as a matter of law, breached a part of the Beaumont agreement. The premature, attempted, wrongful reductions by Spurlock and Crest seemingly occurred at about the same time—if not simultaneously—with Judy's filing the lien on the "Beaumont Job". Thus, this record is unique requiring individualistic rulings by us.

■ Thus, we conclude and hold that these wrongful actions on the part of each party were of such a contemporaneous nature that no meaningful, legally enforceable prior breach of the Beaumont agreement should control as a complete defense. Therefore, the issues of the damages sustained by each litigant for the breaches of the Beaumont agreement should be retried upon remand and setoff one against the other by correct judicial actions. Only in this manner can all the proper controlling issues be retried and then through proper judicial actions and court orders can an ultimate, just, and equitable balance be struck.

The points of error, the reply points, and the various questions (issues) have been considered and weighed by us. In this opinion, we have endeavored to write on and determine those points and issues that are dispositive of this appeal.

Thus in accordance with this opinion we reverse the judgment and remand the cause subject to the limitations and instructions as set out above.

■ Murray complains that Crest hired all of Murray's workers and personnel after Murray admittedly could not continue the work on the three jobs. Maybe this was admirable, maybe it was not; nevertheless, Crest was legally obliged under Texas law to minimize its losses and damages, if any, which minimization, in turn, would enure to the benefit of the Murray interests. Murray's position and argument against this lawful minimization is not upheld.

Because of this independent, distinct and separate ground of reversal, in the interest of justice, we remand the cause for retrial consistent with this opinion. It is so ordered. We make such order under our broad powers to bring about a just, practical, and pragmatic result, all in the interests of justice and right dealing and fair dealing between the parties.

REVERSED AND REMANDED WITH LIMITING INSTRUCTIONS.