**The Law Offices of ROBERT L. CRILL, INC., Robert L. Crill, Michael K. Russell, and The Law Offices of Arlen D. "Spider" Bynum, P.C., Appellants,**

v.

**Monte BOND, Appellee.**

**No. 05–98–01796–CV.**

Court of Appeals of Texas, Dallas.

Oct. 17, 2001.

Michael Russell, Dallas, Broadus A. Spivey, Spivey & Ainsworth, Austin, Robert L. Crill, Law Offices of Robert L. Crill, Inc., Dallas, for Appellant.

Jim Fallon, Law Office of Jim Fallon, Sherman, for Appellee.

Before Justices LAGARDE, JAMES, and DODSON.[1]

## OPINION

CARLTON B. DODSON, Justice (Assigned).

This appeal involves a dispute among attorneys over a referral fee. Following a

---

1. The Honorable Carlton B. Dodson, Justice, Court of Appeals, Seventh District of Texas at Amarillo, Retired, sitting by assignment.

bench trial, the court determined that appellee Monte Bond was entitled to the referral fee in dispute and rendered judgment against appellants in the sum of $100,000, plus prejudgment interest of $61,040. In fourteen issues, appellants generally contend the trial court erred in determining Bond was entitled to the referral fee. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

This is the second appeal of this matter. In the first appeal, we reversed the trial court's take-nothing summary judgment against Bond and remanded the cause for further proceedings. *Bond v. Crill,* 906 S.W.2d 103, 107 (Tex.App.—Dallas 1995, no writ). The case was subsequently tried to the court, and the trial court rendered judgment in favor of Bond against all appellants. We recount the following facts as they were developed at trial.

Bond alleged that in April 1991, he was informed by Katherine Adams, a legal assistant at his firm, of a conversation she had with an acquaintance, Gaye Leach,[2] regarding a personal injury matter involving Leach's comatose sister, Cathey Wright. Adams requested that Bond speak with Leach, and he agreed to do so. Leach later called Bond and discussed her sister's situation at length, including various insurance coverage disputes and abuse Wright had suffered at a healthcare facility known as the Greenery Rehabilitation Center (the Greenery). Neither Bond nor his firm handled personal injury matters. Bond therefore called Melody Burke, an attorney with the Law Offices of Robert L. Crill, Inc. (Crill, Inc.) in Fort Worth, to determine whether her firm would be interested in pursuing the matter. Bond previously had referred a case to Burke's

firm and received a referral fee of 50% of the attorney's fees.

Bond and Burke discussed the matter that day, including the possibility that the statute of limitations for Wright's claims against certain of her insurers, including BSC Life Insurance Company (BSC), arguably would expire the next day. Based on her conversation with Bond, Burke contacted Wright's mother, Patricia McCain, who was Wright's primary care provider, and arranged a meeting with her that evening. Robert L. Crill, the principal of Crill, Inc., also attended the meeting. At the meeting, Crill and Burke agreed to represent McCain, Wright, and Wright's son (the Wright family). Burke testified that the representation was to include all claims arising out of the facts giving rise to Wright's injuries, including both litigation against BSC and the Greenery.

According to Bond and Burke, the two talked the next day and Burke confirmed that Crill, Inc. had "signed up" the matter and Bond would receive a 50% referral fee of any attorney's fees recovered, as he had for the previous matter he referred. Later, Burke contacted Bond at Crill's request and asked him to reduce his referral fee to one-third in order to associate an additional attorney on the matter, Michael K. Russell. Bond agreed. At trial, Russell confirmed that the day following the referral he assisted Burke in drafting the initial pleading in a suit filed that day against BSC (the BSC case). Burke testified that Russell was aware of Bond's financial interest in the matter from the beginning of the representation. Russell also acknowledged that he understood Bond was asserting a claim for a referral fee.

---

**2.** The name "Gaye Leach" is spelled differently in various portions of the record. We use the spelling in Bond's pleadings.

After Russell and Burke finished drafting the original petition in the BSC case, Burke faxed the pleading to Bond in Dallas for filing. According to Bond and Burke, Bond agreed to be added to the pleadings as an accommodation to assist in filing the lawsuit in Dallas. The BSC case, however, did not result in any recovery for the Wright family. Instead, sanctions were imposed against the filing attorneys, including Bond, and the case was dismissed. Bond successfully obtained relief from the sanctions order by arguing that he appeared in the case merely as an accommodation to facilitate filing the suit in Dallas. Subsequently, the trial court's order of dismissal was reversed, and the case was remanded for further proceedings. By way of deposition, McCain testified that the plaintiffs received a pledge of cooperation from the defendants in exchange for dismissing the BSC case following remand.

A few months after filing the BSC case, Burke left Crill, Inc. and took over the practice of another attorney. Thereafter, Robert Crill sought to refer the Cathey Wright matter to other attorneys and urged McCain to seek representation elsewhere. In late 1991, after being unsuccessful in securing other representation for the Wright family, Crill filed suit on their behalf against the Greenery (the Greenery case). Russell also participated in the Greenery case and from time to time discussed the status of the case with Bond. By letter dated August 30, 1993, Crill requested that both Russell and Bond pay one-third of the cost to hire an expert witness in the Greenery case. Bond refused because he believed his referral fee agreement did not require him to share in expenses. Burke also testified that typically a referring attorney's involvement in a case with Crill is limited to "one call" and Crill always fronted expenses himself. Russell did participate in sharing the costs, and Crill also enlisted another attorney, Gary D. Corley, to assist in prosecuting the case and sharing expenses.

In December 1993, after the Greenery case had been ongoing for two years, McCain signed a written contingency fee agreement with Crill (in his individual capacity) and Russell authorizing them to pursue a cause of action against the Greenery and any other person liable for the mistreatment of Cathey Wright at that facility.[3] The agreement provided for a contingency fee of 40%. Additionally, in January 1994 Crill and Russell signed a fee sharing agreement with Corley in which Crill and Russell agreed to assign to Corley one-third of their interest in the 40% contingency fee contract with McCain. Neither the December 1993 agreement nor the January 1994 agreement mentioned Bond.

In May 1994, Crill filed the present case in Grayson County seeking a declaratory judgment that Bond had no interest in any recovery of attorney's fees in the Greenery case. Crill also joined Russell and Corley in the suit. In substance, Crill's position was that Bond's referral, if any, was limited solely to the BSC case and Bond has no interest in the Greenery case. While the Grayson County suit was pending, the Greenery case settled, resulting in a net recovery of attorney's fees of $300,000. Bond intervened in the Greenery case and appeared at the "prove-up" hearing for the settlement to assert his one-third interest in the attorney's fees. At the hearing, Russell, Crill, and Bond entered into an agreement on the record to place $100,000

**3.** McCain signed the contract in her individual capacity and as next friend for Cathy Wright and Wright's son.

in Russell's trust account at The Law Offices of Arlen D. "Spider" Bynum, P.C. (Bynum, P.C.) until Bond's claim was "finally resolved either by court order or fee dispute committee or agreement." The trial court later signed an agreed judgment in the Greenery case which, inter alia, awarded attorney's fees to Crill, Russell, Corley, and another attorney unconnected with the present case. The judgment did not mention Bond and was not appealed.

In the Grayson County action, Crill, Russell, and Corley filed motions for summary judgement asserting that any referral fee agreement Bond may have had was unenforceable pursuant to the Texas Disciplinary Rules of Professional Conduct because it was not disclosed to or approved by the client. The trial court granted summary judgment in favor of appellants, and the same day Russell caused the $100,000 held in trust to be disbursed from his firm's trust account to Crill, Bynum, P.C., and Corley. We later reversed the trial court's judgment, concluding that the summary judgment evidence failed to conclusively establish that the circumstances of the alleged referral agreement mandated disclosure. *Bond,* 906 S.W.2d at 107. Accordingly, we remanded the case for further proceedings. *Id.*

Following remand, the case was tried to the court, and the court rendered judgment in favor of Bond against all parties except Corley.[4] This appeal followed.

In their first issue, appellants complain there is no evidence or insufficient evidence of any consideration to support the referral fee agreement. Specifically, appellants assert that the referral fee agreement with Bond lacked consideration because Adams, a legal assistant in Bond's law firm, referred McCain to Crill, Inc. (through McCain's daughter, Leach) before Bond did.

The legal and factual sufficiency of the trial court's implied findings[5] may be challenged on appeal in the same manner as jury findings. *Brown v. Comm'n for Lawyer Discipline,* 980 S.W.2d 675, 679 (Tex.App.—San Antonio 1998, no pet.) (citing *Hanners v. State Bar,* 860 S.W.2d 903, 912 (Tex.App.—Dallas 1993, writ dism'd)). In considering a "no evidence" or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988). If more than a scintilla of evidence is offered on a fact, we will overrule the point of error. *See Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983).

In reviewing a "great weight" or factual insufficiency point, we consider and weigh all the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain,* 709 S.W.2d at 176. The trier of fact, as

---

4. The trial court rendered a take-nothing judgment in favor of Corley. Bond did not appeal from the judgment in favor of Corley.

5. Although the trial court concluded Bond was entitled to the referral fee, it did not make an express finding regarding consideration. Nor does the record reflect any request for such a finding. Rule 299 of the Texas Rules of Civil Procedure provides that "omitted unrequested elements, when supported by the evidence, will be supplied by presumption in support of the judgment."

the exclusive judge of the credibility of the witnesses and of the weight to be given to their testimony, has the right to believe one witness and disbelieve another, or to believe part of the testimony of a witness and disbelieve any other part of such testimony. *Lemond v. Jamail,* 763 S.W.2d 910, 913 (Tex.App.—Houston [1st Dist.] 1988, writ denied); *see also Benoit v. Wilson,* 150 Tex. 273, 281, 239 S.W.2d 792, 796 (Tex.1951). The fact that testimony of an interested party conflicts with testimony of another witness merely presents an additional issue of credibility for the factfinder. *See Jamail,* 763 S.W.2d at 913.

 Consideration is a present exchange bargained for in return for a promise. *Roark v. Stallworth Oil & Gas, Inc.,* 813 S.W.2d 492, 496 (Tex.1991). It can be either a benefit to the promisor or a detriment to the promisee. *Id.* It may consist of some right, interest, profit, or benefit that accrues to one party, or, alternatively, of some forbearance, loss, or responsibility that is undertaken or incurred by the other party. *Solomon v. Greenblatt,* 812 S.W.2d 7, 15 (Tex.App.—Dallas 1991, no writ). A promise for a promise is sufficient consideration in Texas. *Crest Const., Inc. v. Murray,* 888 S.W.2d 931, 942 (Tex. App.—Beaumont 1994), *rev'd on other grounds,* 900 S.W.2d 342 (Tex.1995). A contract that lacks consideration lacks mutuality of obligation and is unenforceable. *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 409 (Tex.1997).

 We conclude there is more than a scintilla of evidence to support a finding of consideration for the referral fee. Both Bond and Burke testified that Bond referred the case to Crill, Inc. and that Burke agreed to pay Bond a referral fee. Burke further testified that she told Crill of the referral, he asked her to obtain Bond's consent to reduce the fee to one-third, it was common practice for Crill to pay a referral fee, and that Crill had previously paid Bond a 50% referral fee on another case. Additionally, Bond testified without objection that he referred the matter to Burke's firm as consideration for the fee. Considering the prior business relationship and the contemporaneous discussion of the referral fee among the participants, the factfinder could conclude Bond referred the matter to Burke's firm in exchange for a referral fee, as he had in the past, and Burke and Crill both understood that to be the case. Therefore, there is legally sufficient evidence to conclude Bond referred the matter to Crill, Inc. in exchange for a promise to pay a referral fee in the event the firm obtained the representation. The referral in exchange for a promise constitutes consideration.

We further conclude there is no overwhelming evidence to the contrary. Rather, the evidence is conflicting. First, neither Adams nor Leach testified. Therefore, the only evidence that Adams may have mentioned Burke to Leach is based on second-hand testimony which is, at best, equivocal. For example, Russell testified Crill had told him that Bond's paralegal told Leach to call Burke. Similarly, McCain stated it was her "understanding" that a friend of her daughter (Leach) had recommended she contact Burke.

On the other hand, there is substantial evidence to support Bond's contention that the contact was made through him, rather than on the basis of any recommendation from Adams. Bond testified Adams did not know Burke and Adams asked him to talk to Leach. After he did so, he referred Leach and her family to Burke and arranged for Burke to call the family. Burke's testimony was substantially the same except she thought it "possible" Adams may have consulted Crill, Inc. about a legal matter some two years earli-

er. Burke's testimony on this point, however, was equivocal and contradicted by Bond. Regardless, the evidence is uncontradicted that neither Leach nor anyone else in the Wright family called Burke; instead, Leach called Bond. If Adams had recommended that Leach call Burke, there would have been no reason for her to call Bond instead. It was further undisputed that after talking with Leach, Bond called Burke and arranged for her to contact the Wright family, and it was this contact that resulted in Crill, Inc. obtaining the representation. It was the factfinder's prerogative to choose Bond's version of events over that of appellants. On the basis of the record, we are not persuaded a finding of consideration is so against the great weight and preponderance of the evidence as to be manifestly unjust.

Finally, we observe that this case is distinguishable from *Fleming v. Campbell,* 537 S.W.2d 118 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.), relied on by appellants. In *Fleming,* the referring attorney admitted the consideration for the referral fee occurred prior to the promise to pay it. *Id.* at 120. Here, there was no such admission. Rather, Bond testified he referred the matter to Burke in consideration for a fee. Also, there is evidence the referral was part of an ongoing business relationship between Bond and Burke's firm. In summary, we conclude there is more than a scintilla of evidence demonstrating consideration to support an agreement to pay the referral fee, and such a finding is not against the great weight and preponderance of the evidence. Accordingly, we overrule appellants' first issue.

In their second issue, appellants contend there is no evidence Burke acted within the scope of her employment with Crill, Inc. when she agreed to pay Bond a referral fee. Appellants further contend that even if her agreement was binding on Crill, Inc., it was not binding on Crill individually, Russell, Corley, or Bynum, P.C.

Burke testified that Crill, Inc. always paid a 50% referral fee to referring attorneys. She further stated she treated Bond in the same manner as she did other referring attorneys and she had been involved in similar transactions with some fifty attorneys. Additionally, Burke testified she informed Crill that Bond had referred the matter to the firm and Crill asked her to call Bond to determine whether he would agree to a three-way division of the fees so he could associate Russell on the case. Burke then called Bond as Crill had instructed and obtained Bond's agreement. Accordingly, there is some evidence Burke was authorized to agree to a referral fee on behalf of Crill, Inc. Appellants' contention that the agreement was not binding on the other attorneys who later worked on the case is premised on the assumption that the referral agreement was not supported by consideration. As discussed above, that is not the case. Accordingly, we overrule appellants' second issue.

In their third issue, appellants contend "Crill, Russell and Bynum, P.C. were legally justified in accepting employment by McCain to prosecute" the Greenery case because Crill, Inc. never had a written contingent fee agreement with McCain. Assuming for purposes of discussion that Crill, Inc. did not have such an agreement,[6] we nonetheless resolve this

---

6. Our review of the record indicates there was conflicting evidence on this point. Burke testified she thought McCain had executed a written employment agreement with the firm shortly after the first meeting with McCain. Additionally, Crill testified there may have been an earlier contract executed with

issue against appellants. Crill began representing the Wright family in April 1991 and filed the Greenery case in late 1991. Crill also signed pleadings in that case on behalf of Crill, Inc. at least through October 1993. In December of 1993, Crill signed a contingency fee agreement with McCain in his individual capacity, along with Russell. Russell testified the December 1993 agreement was executed because he looked through Crill's files and could not find a written employment agreement. Crill testified he signed the agreement in his individual capacity because his professional corporation was no longer active.

 Appellants ask us to hold that because Crill assumed the representation while he was practicing as a professional corporation, and neglected to obtain a written contingency agreement for over two years, he was free to execute a new agreement in his individual capacity and avoid the fee sharing agreement he previously had made with Bond. Appellants provide us with no authority for this position, and we decline to adopt it. As Bond asserts, Crill's failure to reduce his contingency agreement to writing for over two years rendered the agreement voidable *by the client.* *See* TEX. GOV'T CODE ANN. § 82.065(b) (Vernon 1998) ("A contingent fee contract for legal services is voidable by the client if it is procured as a result of conduct violating the laws of this state or the Disciplinary Rules ...."); *see also Enochs v. Brown,* 872 S.W.2d 312, 318 (Tex.App.—Austin 1994, no writ) (holding the requirement that contingent fee agreements be in writing operates similarly to the statute of frauds, making the agreement voidable rather than void). We know of no authority, and appellants cite none, which would hold that Crill, Inc.'s commitments to third parties incurred during the first two years of the litigation are voida-

McCain that was later amended to include

ble because Crill neglected to obtain a written contingency agreement with the client. For example, we know of no reason Crill, Inc. could avoid paying court reporter fees, copy expenses, or process server fees incurred prior to the date McCain signed the December 1993 agreement. As discussed below in connection with appellants' eleventh point of error, Crill's attempt to avoid his agreement with Bond by executing a new agreement in his individual capacity is evidence of his attempt to improperly avoid paying the fee, rather than proper grounds for avoiding it. We overrule appellants' third issue.

 In issues four through six, appellants generally claim the referral fee agreement is unenforceable for failure to comply with the Texas Disciplinary Rules of Professional Conduct. We first consider appellants' fifth issue in which appellants assert that Bond was not entitled to a referral fee because he was not a "forwarding lawyer" within the meaning of rule 1.04(f)(1)(ii). *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(f)(1)(ii), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A–1 (Vernon 1998) (Tex. State Bar R. art. X, § 9). In relevant part, this rule provides that an agreement for division of a fee between lawyers who are not in the same firm shall not be made unless "made with a forwarding lawyer." *Id.* Appellants contend Bond could not be a forwarding lawyer because he did not have an attorney-client relationship with McCain, the referred client. In short, appellants argue that Bond talked only with McCain's daughter, Leach, and never talked with McCain, the actual client (individually and as next friend for her daughter, Wright). Therefore, appellants contend Bond did not qualify as a "forwarding lawyer" under the disciplinary rules.

Corley.

Appellants' authority for this issue is limited to citing disciplinary rule 1.04. Appellants cite no authority for their contention that "Bond could not become a forwarding attorney in the absence of a professional relationship giving rise to an attorney-client privilege." Consequently, we conclude the contention is inadequately briefed and presents nothing for review. *See Meachum v. Comm'n for Lawyer Discipline*, 36 S.W.3d 612, 616 (Tex.App.—Dallas 2000, pet. denied); *Favaloro v. Comm'n for Lawyer Discipline*, 13 S.W.3d 831, 840 (Tex.App.—Dallas 2000, no pet.); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (appellate court has discretion to waive point of error due to inadequate briefing). Nevertheless, we further observe there is evidence from which the court could have concluded that McCain relied on the assistance of her daughter, Leach, to secure representation and that, in effect, Leach was a client representative. *See* Tex.R. Evid. 503(a)(1)(2) (defining "representative of client"). McCain clearly was aware that Leach was seeking representation for the Wright family, and McCain testified she gave permission for the Crill firm to contact her, presumably through Leach. Furthermore, appellants' version of events is consistent with this position. Appellants also assert Crill obtained the representation through Leach; therefore, appellants tacitly concede Leach must have been acting as McCain's representative. Assuming without deciding that it was necessary for Bond to communicate directly with the client before he referred the matter, we conclude that under these circumstances Bond's conference with Leach qualifies. We overrule appellants' fifth issue.

In their sixth issue, appellants contend the referral agreement is unenforceable because the agreement did not comply with the requirement of the disciplinary rules that "the client is advised of, and does not object to, the participation of all the lawyers involved." Tex. Disciplinary R. Prof'l Conduct 1.04(f). As we stated in our prior opinion in this case:

Comment 10, accompanying rule 1.04(f), explains when a client does not need to be advised of a referral agreement. Comment 10 states in relevant part:

Because the association of additional counsel normally will result in a further disclosure of client confidences and have a financial impact on a client, advance disclosure of the existence of that proposed association and client consent generally are required. Where those consequences will not arise, disclosure is not mandated by this Rule.

Tex. Disciplinary R. Prof. Conduct 1.04 cmt. 10 (1989). Thus, an exception to the mandatory disclosure requirement can arise when there is no disclosure of client confidences to the forwarding attorney and no financial impact on the client. Thus, the party asserting a violation of disciplinary rule 1.04(f) has the burden of negating the exception.

*Bond*, 906 S.W.2d at 106.

In reversing the trial court's summary judgment in the first appeal, we held that although Crill established McCain was not advised of the referral agreement, Crill "failed to prove that the alleged agreement did not come within the exception to the disclosure requirement. Nothing in the record shows that client confidences were disclosed to Bond or that the fee agreement had a financial impact on McCain (or on Wright)." *Id.* at 107 (citation omitted). In the current appeal, appellants contend they established at trial that these exceptions were inapplicable by showing client confidences were imparted to Bond during the course of the litigation and payment of

a referral fee would have prevented Corley from participating, thus impacting the client financially.

Our review of the record shows the evidence was conflicting regarding whether client confidences were disclosed to Bond. Russell testified generally that he "probably" disclosed trial strategy to Bond; however, neither he nor any other party testified as to any specific confidences that were actually disclosed. Bond testified that although Russell generally kept him informed of the progress of the Greenery case, no confidences were disclosed to him during the course of the litigation. Additionally, we note there was no need to impart client confidences to Bond given appellants' position that Bond "never contributed any time or money toward prosecuting the Greenery case." On the basis of the conflicting evidence, the factfinder was entitled to conclude that no confidences were disclosed.

Next, appellants contend any requirement to pay Bond a referral fee would have had a financial impact on the client because Corley was adamant in refusing to become involved in the litigation if Bond had an interest in the fees. Corley did not become involved, according to appellants, until Russell and Crill assured him Bond's interest was limited to the BSC litigation. Appellants further contend that the Greenery case did not settle until after Corley became involved, that his involvement was necessary to fund the litigation, and he was instrumental in creating the settlement value received by the client.

 We are persuaded that appellants' contention regarding Corley's participation is speculative and does not constitute conclusive evidence of a financial impact upon the client. Russell testified he was competent to pursue the matter and his firm was capable of fronting the litigation expense. He further testified that the "Rosetta Stone" which led to the settlement of the Greenery case was the deposition testimony of a doctor who testified Wright had been abused during her stay at the Greenery. There is no reasonable basis for concluding either this event would not have occurred without Corley's involvement or the case ultimately would have concluded differently. As Burke testified, the referral fee agreement in and of itself had no financial impact on the client. The fee was based on the amount of attorney's fees collected by the attorneys prosecuting the case; the agreement did not require the client to pay any amount in addition to what the client otherwise agreed to pay. Accordingly, we conclude appellants did not negate the comment 10 exception, and Bond provided some evidence the exception applied. While the more certain professional practice would have been to have disclosed the referral fee agreement and obtained the client's consent, we are not persuaded the trial court erred in failing to determine the agreement here violated public policy and was unenforceable. Accordingly, we overrule appellants' sixth issue.

We reach the same result for appellants' fourth issue. Based on a statement in *Jamail*, appellants claim that evidence of Crill honoring a prior referral fee agreement with Bond is not relevant because the referral fee agreement at issue was void as against public policy. *See Jamail*, 763 S.W.2d at 914. We have concluded the agreement is not void. Therefore, the court's statement in *Jamail* is not relevant to our disposition. Appellants' fourth issue is overruled.

 In appellants' seventh issue, they contend Russell is not liable individually because he acted as a disclosed principal of Bynum, P.C. The only authority appellants cite for this issue is *Eppler, Guerin & Turner, Inc. v. Kasmir*, 685 S.W.2d 737

(Tex.App.—Dallas 1985, writ ref'd n.r.e.). The *Kasmir* case stands for the proposition that an agent of a disclosed principal is not liable in contract. *See id.* at 738. However, this proposition does not address Bond's tort claims against Russell. In this regard, the general rule is that an agent is liable for his own torts. *See Keyser v. Miller,* 47 S.W.3d 728, 729 (Tex.App.— Houston [1st Dist.] 2001, pet. filed) (op. on reh'g); *see also Leitch v. Hornsby,* 935 S.W.2d 114, 117 (Tex.1996). Therefore, appellants have not established that the trial court erred in rendering judgment against Russell. Consequently, we overrule appellants' seventh issue.

In their eighth issue, appellants contend Bond's tortious interference claim against Bynum, P.C. is barred by the two-year statute of limitations. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.003 (Vernon Supp. 2001). Assuming for purposes of discussion that appellants are correct, nevertheless, appellants have not challenged Bond's breach of contract claim against Bynum, P.C.; nor have appellants successfully challenged the conspiracy claim.[7] Accordingly, these additional claims constitute an independent basis for the judgment. *See Nationwide Prop. & Cas. Ins. Co. v. McFarland,* 887 S.W.2d 487, 496 (Tex. App.—Dallas 1994, writ denied); *see also Northeast Wholesale Lumber, Inc. v. Leader Lumber, Inc.,* 785 S.W.2d 402, 406 (Tex.App.—Dallas 1989, no writ). Consequently, we overrule appellants' eighth issue because it does not constitute grounds for reversal.

■■■ In issues 9 and 9a, appellants contend both that disbursement of the $100,000 fee from the Bynum, P.C. trust account did not violate the parties' rule 11 agreement and that Bond was not harmed by the disbursement. Appellants cite no legal authority in support of these issues. Consequently, we conclude the issues are inadequately briefed and present nothing for review. *See Meachum,* 36 S.W.3d at 616; *Favaloro,* 13 S.W.3d at 840; *see also Fredonia State Bank,* 881 S.W.2d at 284. Even if the issues were adequately briefed, however, we would conclude the issues do not present reversible error. The rule 11 agreement provided that Russell would hold the funds in his trust account until the dispute was "finally resolved either by court order or fee dispute committee or agreement." Appellants disbursed the money the same day the trial court granted the summary judgment which we reversed in the first appeal of this case. While the summary judgment may have been "final" in the sense that the judgment was then appealable, it clearly did not "finally resolve" the litigation. Under such circumstances, we cannot conclude the trial court erred in determining disbursement of the funds from trust violated the parties' rule 11 agreement. Appellants' second contention, that Bond was not harmed, is predicated on the assumption that we would sustain appellants' earlier issues. However, we did not. *See Northeast Wholesale Lumber, Inc.,* 785 S.W.2d at 406. Accordingly, we overrule appellants' issues 9 and 9a.

**7.** Appellants have not asserted that the conspiracy claim is barred by limitations. We also note that there is some evidence Russell contractually agreed to Bond's referral fee. At Crill's request, Bond agreed to reduce his fee to one-third to allow Russell to participate in the litigation and share in the attorney's fees. Russell's subsequent agreement to work on the case is some evidence that he agreed to participate in Crill's arrangement with Bond. Actions for breach of contract are governed by a four-year statute of limitations. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(3) (Vernon Supp.2001); *Williams v. Khalaf,* 802 S.W.2d 651, 653 (Tex.1990).

■ In their tenth issue, appellants contend Bond's claims are barred by the doctrine of res judicata. Appellants note that Bond intervened in the Greenery case and asserted his right to one-third of the attorney's fees. Appellants argue that, notwithstanding the rule 11 agreement, the final judgment in the Greenery case disposed of all Bond's claims because it awarded attorney's fees without making any reference to Bond or the parties' agreement. Appellants therefore contend the judgment in the Greenery case is res judicata to the present action.[8]

■ Res judicata precludes relitigation of claims that have been finally adjudicated, or that arise out of the same subject matter and could have been litigated in the prior action. *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex. 1992). Res judicata requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex.1996).

Appellants have not established that identity of parties exists between the present case and the prior one. Additionally, appellants have not asserted or established that the parties are in privity. Nor have appellants asserted on appeal that Bond's claims are barred by the related doctrine of collateral estoppel. Accordingly, we overrule appellants' tenth issue.

■ In their eleventh issue, appellants contend there was no conspiracy to harm Bond.[9] Appellants contend they have done "nothing more than decline to submit to [Bond's] fallacious claims," and note that mere agreement to resist a claim is not an actionable conspiracy. *See Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). From our review of the record, we conclude the evidence supports a trial court finding that appellants engaged in an actionable civil conspiracy.

■ As stated in *Massey:*

An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.

*Id.* (citations omitted).

From the evidence, the factfinder could conclude that appellants' conduct through August 1993 was consistent with Bond's position. There was testimony the Greenery case was contemplated from the beginning of appellants' representation of the Wright family. Also, Bond and Burke testified that Crill agreed to pay Bond a referral fee for all claims arising out of the facts giving rise to Wright's injuries, and Crill and Russell confirmed this is the common agreement when matters are referred between attorneys. Additionally, the evidence shows McCain expressed displeasure in Crill delaying the filing of the

8. Bond observes that appellants' position is inconsistent with their later contention in the Dallas court that the Grayson County court had dominant jurisdiction over this dispute. Because we conclude appellants have not conclusively established the defense of res ju-

dicata as a matter of law, we need not further address this apparent inconsistency.

9. We interpret appellants' eleventh issue to raise a no evidence point. Even if we analyzed the issue as a factual insufficiency point, however, we would reach the same result.

Greenery case until late 1991, and Crill himself testified he was concerned about potential malpractice exposure if he did not file the case. Later, in August 1993, Crill requested that Bond pay one-third of the fees for retaining an expert in the Greenery case. Finally, Russell testified that he periodically kept Bond informed. On the basis of this evidence, the factfinder could conclude there was no reason for Crill to file the Greenery case in 1991, for Russell to keep Bond informed, or for Crill to ask Bond to pay one-third of the expert witness fees unless Bond in fact had an agreement with Crill and Russell to receive one-third of the attorney's fees as a referral fee for the Greenery case.

Nonetheless, after Bond refused to participate in paying expenses for the Greenery case, appellants met, agreed among themselves that Bond was not entitled to a referral fee in the Greenery case, and associated a new lawyer on the file (Corley) who was willing to participate in fronting expenses. Appellants then executed a new agreement with the client, which Crill purported to sign in his individual capacity, even though Crill had represented the same client for at least two years as Crill, Inc. At that time, Crill and Russell also executed the January 1994 referral fee agreement with Corley. From the evidence, the factfinder could infer that appellants' apparent change in position was an attempt to deprive Bond of the fee to which he was entitled and appellants entered into the 1993 and 1994 agreements with the intent to "cut out" Bond in favor of Corley. Concluding that the evidence is legally sufficient to support a finding of civil conspiracy, we overrule appellants' eleventh issue.

In their twelfth issue, appellants contend there is no evidence of fraud. Appellants' entire argument for this issue consists of setting forth the definition of fraud and stating "[t]here is nothing in the evidence bearing any remote resemblance to the foregoing definition." We conclude appellants have inadequately briefed this issue and it presents nothing for review. Appellate briefing that is wholly conclusory and provides no substantive analysis fails to preserve the issue for review. *See Meachum,* 36 S.W.3d at 616; *Favaloro,* 13 S.W.3d at 840; *see also Fredonia State Bank,* 881 S.W.2d at 284. Furthermore, Bond does not rely on his fraud claim to support the judgment; therefore, the issue is moot. Accordingly, we overrule appellants' twelfth issue.

In their thirteenth issue, appellants contend Bond repudiated and anticipatorily breached the referral agreement by opposing the sanctions imposed against him in the BSC case and in refusing to pay one-third of the expert witness fees in the Greenery case. Appellants cite no legal authority in support of this issue and the assertions made thereunder. Accordingly, we conclude this issue also presents nothing for review. *See Meachum,* 36 S.W.3d at 616; *Favaloro,* 13 S.W.3d at 840; *see also Fredonia State Bank,* 881 S.W.2d at 284. Furthermore, in this instance, there was substantial evidence from which the factfinder could have found that Bond's agreement with Crill did not require Bond to pay expenses. In that regard, Bond's refusal to participate in paying expenses could not have been a breach of the agreement. Appellants' thirteenth issue is overruled.

In their final issue, appellants contend the trial court erred in failing to make findings of fact and conclusions of law. We previously abated this case to allow the trial court to make findings of fact and conclusions of law and invited the parties to submit further briefing after the trial court's findings and conclusions were filed.

This has been completed.[10] Consequently, the issue is moot and presents nothing further for review. Appellants' final issue is overruled.

In sum, we overrule appellants' fourteen issues and their contentions made thereunder. The trial court's judgment is affirmed.

10. Only appellants filed a supplemental brief. As we read the supplemental brief, it provides additional argument in support of the issues already raised in the main briefs, but it does not raise new issues on appeal. We have reviewed the supplemental brief, and we conclude the arguments raised therein are adequately addressed in this opinion and do not alter our disposition.